1  Roger A. Colvin, Esq. (SBN 068773)
   Vincent C. Ewing, Esq. (SBN 177708)
2  Alvarez-Glasman & Colvin
   Attorneys at Law
3  13181 Crossroads Parkway North
   Suite 400 – West Tower
4  City of Industry, CA  91746
   Telephone: (562) 699-5500
5  Facsimile:  (562) 692-2244
   rcolvin@agclawfirm.com
6
7  Attorneys for Defendants, City of Chico,
   Jeremy Gagnebin, Alex Fliehr, and Jared Cumber
8
9              UNITED STATES DISTRICT COURT
10            EASTERN DISTRICT OF CALIFORNIA
11  DAVID PHILLIPS, individually and as    ) Case No.:  2:18-cv-00153-JAM-DMC
    a co-successor-in-interest to Decedent  )
12  DESMOND PHILLIPS; DELPHINE              ) (*Assigned to the Honorable District Court*
    NORMAN, individually and as a co-       ) *Judge John A. Mendez*)
13  successor-in-interest to Decedent       )
    DESMOND PHILLIPS; CHADRICK              )
14  INGRAM, individually; and K.T. by and   ) NOTICE OF MOTION AND MOTION
    through his Guardian Ad Litem           ) OF DEFENDANTS, CITY OF CHICO,
15  LATISHA WILLIAMS,                       ) JEREMY GAGNEBIN, ALEX FLIEHR,
                                            ) AND JARED CUMBER FOR
16                                          ) SUMMARY JUDGMENT OR, IN THE
                  Plaintiffs,               ) ALTERNATIVE, PARTIAL
17                                          ) SUMMARY JUDGMENT;
         v.                                 ) MEMORANDUM OF POINTS AND
18                                          ) AUTHORITIES; DECLARATION OF
    CITY OF CHICO, a municipal              ) ROGER A. COLVIN; AND
19  corporation; JEREMY GAGNEBIN,           ) DECLARATION OF KAREN BROSE
    individually and in his capacity as an  )
20  officer for the Chico Police Department; )
    ALEX FLIEHR, individually and in his    ) [Fed. R. Civ. P., Rule 56]
21  capacity as an officer for the Chico    )
    Police Department; JARED CUMBER,        )
22  individually and in his capacity as an  ) DATE:       July 30, 2019
    officer for the Chico Police Department; ) TIME:       1:30 p.m.
23  and DOES 1-50, inclusive, individually  ) CTRM:       6
    and in their official capacities as police )
24  officers for the CITY OF CHICO Police   )
    Department,                             ) [Statement of Undisputed Facts;
25                                          ) [Proposed] Order and Exhibits filed
                                            ) concurrently herewith]
26                                          )
                  Defendants.               )
27                                          )
28                                          )

                           1

TO THE HONORABLE COURT, PLAINTIFFS AND TO THEIR

ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT Defendants CITY OF CHICO, JEREMY

GAGNEBIN, ALEX FLIEHR and JARED CUMBER (collectively, the "Chico

Defendants") hereby move the Court for an order granting Summary Judgment on

the Complaint filed by Plaintiffs, or, in the alternative, Partial Summary Judgment.

The hearing will take place on July 30, 2019, at 1:30 p.m. before the

Honorable John A. Mendez, United States District Judge, in Courtroom 6 of the

United States District Court for the Eastern District of California located at 501 I

Street, Sacramento, California  95814.

The Motion is made pursuant to Federal Rules of Civil Procedure, Rule 56, on

the following grounds:

1.     The Officer Defendants are entitled to summary judgment in their favor

on Plaintiffs' First Cause of Action for Survival Action – Excessive Force on the

grounds that: (1) the amount of force utilized during this incident was objectively

reasonable as a matter of law; and (2) the claim is barred by the doctrine of qualified

immunity.

2.     The Officer Defendants are entitled to judgment in their favor on

Plaintiffs' Second Cause for Survival Action – Denial of medical care on the

grounds that the rendering of medical aid/treatment was reasonable under the

Fourteenth Amendment and because the cause of action is barred by the doctrine of

qualified immunity.

3.     The Officer Defendants are entitled to judgment in their favor on

Plaintiffs' Third Cause of Action for violation of Plaintiffs' Fourteenth Amendment

rights/right to familial relationship because the individual officers did not act with a

subjective purpose to cause harm unrelated to the legitimate object of arrest and

because the action is barred by the doctrine of qualified immunity.

4.     Defendant City of Chico is entitled to judgment in its favor on

2

Plaintiffs' Fourth Cause of Action for Municipal Liability for Unconstitutional Custom or Policy because: (1) Desmond Phillips' constitutional rights were not violated; (2) the uncontroverted facts establish that the alleged custom or policy does not exist; (3) the doctrine of qualified immunity bars this claim.

5.     The Officer Defendants are entitled to judgment in their favor on Plaintiffs' Fifth Cause of Action for Wrongful Death – Negligence because the amount of force utilized by the individual officers was objectively reasonable.

6.     The Officer Defendants are entitled to judgment in their favor on Plaintiffs' Sixth Cause of Action for violation of California Civil Code section 52.1 (Bane Act) because the amount of force utilized was objectively reasonable.

7.     The Officer Defendants are entitled to judgment in their favor on Plaintiffs' Seventh Cause of Action for Negligence because the amount of force utilized by the individual defendants was objectively reasonable.

8.     Defendant City and the Officer Defendants are entitled to judgment in their favor on Plaintiffs' Eighth cause of action for violation of Title II of the ADA because it is barred by the doctrine of qualified immunity.

9.     The Officer Defendants are entitled to judgment in their favor on Plaintiffs' Ninth Cause of Action for negligent infliction of emotional distress because the amount of force used by the officers was objectively reasonable.

///
///
///
///
///
///
///
///
///

1         This Motion is based upon this Notice of Motion, the Memorandum of Points

2    and Authorities, the attached Declarations of Roger A. Colvin and Karen Brose, the

3    Separate Statement of Undisputed Facts filed concurrently herewith, the pleadings

4    on file herein, and such oral argument as may be offered by counsel at the hearing on

5    the Motion.

6

7    Dated:  June 20, 2019                 ALVAREZ-GLASMAN & COLVIN
                                         ARNOLD M. ALVAREZ-GLASMAN

8                                             CITY ATTORNEY

9

10                                          /s/ Roger A. Colvin, Esquire

11                                          Roger A. Colvin
                                       Attorneys for Defendants

12                                          City of Chico, Jeremy Gagnebin, Alex
                                       Fliehr, and Jared Cumber

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.     PROCEDURAL HISTORY ........................................................... 12

II.    FACTUAL SUMMARY .............................................................. 12

III.   THE LEGAL STANDARD GOVERNING MOTIONS FOR  SUMMARY
      JUDGMENT ........................................................................... 18

IV.   LEGAL ANALYSIS ................................................................. 19

     A.    DEFENDANT OFFICERS' USE OF DEADLY FORCE WAS
           OBJECTIVELY REASONABLE UNDER THE
           CIRCUMSTANCES ........................................................... 19

     B.    INDIVIDUAL DEFENDANT OFFICERS ARE ENTITLED TO
           QUALIFIED IMMUNITY (THE FIRST, SECOND, THIRD,
           FOURTH, AND EIGHTH CLAIMS FOR RELIEF) ........................ 23

     C.    PLAINTIFFS' "ADA" CLAIM AND QUALIFIED IMMUNITY .... 25

     D.    SUMMARY JUDGMENT SHOULD BE GRANTED ON
           PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM
           BECAUSE CHICO OFFICERS DID NOT ACT WITH A
           SUBJECTIVE PURPOSE TO CAUSE HARM UNRELATED
           TO THE LEGITIMATE OBJECT OF ARREST .............................. 28

     E.    PLAINTIFFS CANNOT STATE A CLAIM FOR NEGLIGENCE,
           NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS OR
           VIOLATION OF THE BANE ACT BECAUSE THE AMOUNT OF
           FORCE UTILIZED BY THE OFFICERS WAS OBJECTIVELY
           REASONABLE .................................................................. 30

          1.    Negligence Claim ................................................. 30

          2.    Negligent Infliction of Emotional Distress ............................ 31

          3.    Plaintiffs' Bane Act Claim Should be Dismissed Because the
              Amount of Force by the Officers was Objectively Reasonable
              .................................................................... 32

     F.    DEFENDANTS' CONDUCT IN RENDERING MEDICAL
           AID/TREATMENT WAS REASONABLE UNDER THE
           FOURTH AMENDMENT AND IS BARRED BY QUALIFIED
           IMMUNITY ..................................................................... 33

ALVAREZ-GLASMAN & COLVIN
ATTORNEYS AT LAW

G.   BECAUSE PLAINTIFFS' CONSTITUTIONAL RIGHTS
         WERE NOT VIOLATED, THERE IS NO MONELL LIABILITY
         ON THE PART OF THE CITY...........................................................34

V.   CONCLUSION ................................................................................36

ALVAREZ-GLASMAN & COLVIN
ATTORNEYS AT LAW

6

# **TABLE OF AUTHORITIES**

**Cases**

*A.D. v. California Highway Patrol*

  (9th Cir. 2013) 712 F.3d 446 ................................................................24

*Act Up!/Portland v. Bagley*

  (9th Cir. 1993) 988 F.2d 868 ........................................................24, 27

*Anderson v. Creighton*

  (1987) 483 U.S. 635 ..............................................................................24

*Anderson v. Liberty Lobby, Inc.*

  (1986) 477 U.S., 242 ..............................................................................18

*Ashcroft v. al-Kidd*

  (2001) 563 U.S. 731 ..............................................................................24

*Billington v. Smith*

  (9th Cir. 2001) 292 F.3d 1177 ..............................................................31

*Brittain v. Hansen*

  (9th Cir. 2006) 451 F.3d 982 ................................................................26

*Burgess v. Superior Court*

  (Cal. 1992) 2 Cal.4th 1064 ....................................................................32

*Celotex Corp. v. Catrett*

  (1986) 477 U.S. 317 ........................................................................18, 35

*Christensen v. Superior Court*

  (Cal. 1991) 54 Cal.3d 868 ....................................................................31

*City and County of San Francisco, Cal., v. Sheehan*

  (2015) 135 S.Ct. 1765 ....................................................................26, 27

*City of Canton, Ohio v. Harris*

  (1989) 489 U.S. 378 ..............................................................................35

*City of Los Angeles v. Heller*

  (1986) 475 U.S. 796 ..............................................................................34

*Clement v. Gomez*

   (9th Cir. 2002) 298 F.3d 898 ...................................................................24

*Cornell v. City and City of Sacramento*

   (Ct. App 2017) 17 Cal.App.5th 766.....................................................33

*County of Los Angeles v. Mendez*

   (2017) 137 S.Ct. 1539 ..........................................................................31

*County of Sacramento v. Lewis*

   (1998) 523 U.S. 833 .............................................................................29

*Eng v. Cooley*

   (9th Cir. 2009) 552 F.3d 1062 ............................................................27

*Estate of Cornejo ex rel. Solis v. City of Los Angeles*

   (9th Cir. 2015) 618 Fed.Appx. 917......................................................33

*Falls Riverway Realty, Inc. v. Niagara Falls, et al.*

   (2d Cir. 1985) 754 F.2d 49 56.............................................................18

*Farmer v. Brennan*

   (1994) 511 U.S. 825 .......................................................................28, 29

*Gonzalez v. City of Anaheim*

   (9th Cir. 2014) 747 F.3d 789 ...............................................................29

*Graham v. Connor*

   (1989) 490 U.S. 386...........................................................19, 20, 31, 33

*Harlow v. Fitzgerald*

   (1982) 457 U.S. 880.............................................................................23

*Hayes v. City of San Diego* ..........................................................................32

*Hope v. Pelzer*

   (2002) 536 U.S. 730.............................................................................24

*Hughes v. Kinsela*

   (9th Cir. 2016) 841 F.3d 1081 .............................................................23



*Jeffers v. Gomez*

   (9th Cir. 2001) 267 F.3d 895 ................................................................ 23

*Kelson v. City of Springfield*

   (9th Cir. 1985) 767 F.2d 651 ................................................................ 28

*Macy's California Inc. v. Superior Court*

   (1st Dist. 1995) 41 Cal.App.4th 744 ................................................... 32

*Malott v. Placer County*

   (E.D. Cal. Feb. 11, 2016) 14-1040 ...................................................... 32

*Marlen F. v. Affiliated Psychiatric Medical Clinic, Inc.*

   (Cal. 1989) 48 Cal.3d 583 ................................................................... 31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*

   (1986) 475 U.S. 574 .............................................................................. 18

*Monell v. Department of Social Services of City of New York*

   (1978) 436 U.S. 658 .................................................................. 12, 34, 35

*Moreland v. Las Vegas Metro. Police Dep't.*

   (9th Cir. 1998) 159 F.3d 365 ............................................................... 28

*O'Guinn v. Lovelock Corr. Ctr.*

   (9th Cir. 2007) 502 F.3d 1056 ............................................................. 25

*Ostling v. City of Bainbride Island*

   (W.D. Wash. 2012) 872 F.Supp.2d 1117 ............................................ 33

*Pearson v. Callahan*

   (2009) 555 U.S. 223 ........................................................................ 23, 24

*Plotnik v. Meihaus*

   (4th Dist. 2012) 208 Cal.App.4th 1590 .............................................. 32

*Plumhoff v. Rickard*

   (2014) 572 U.S. 765 .............................................................................. 22

*Porter v. Osborn*

   (9th Cir. 2008) 546 F.3d 1131 ....................................................... 28, 29

ALVAREZ-GLASMAN & COLVIN

ATTORNEYS AT LAW

9

*Reese v. City of Sacramento*

  (9th Cir. 2018) 888 F.3d 1030 ............................................................. 33

*Reynolds v. County of San Diego*

  (9th Cir. 1996) 84 F.3d 1162 .............................................................. 20

*Saucier v. Katz*

  (2001) 533 U.S. 194 ................................................................... 23, 24

*Scott v. Harris*

  (2007) 550 U.S. 372 ......................................................................... 22

*Scott v. Henrich*

  (9th Cir. 1994) 39 F.3d 912 .............................................................. 20

*Smith v. City of Hemet*

  (9th Cir. 2005) 394 F.3d 689 ......................................................... 19, 20

*Spates v. Dameron Hosp. Assn.*

  (3d Dist. 2003) 114 Cal.App.4th 208 .................................................. 31

*Tennessee v. Garner*

  (1985) 471 U.S. 1 ............................................................................ 20

*Thornhill Pub. Co., Inc. v. General Tel. & Electronics Corp.*

  (9th Cir. 1979) 594 F.2d 730 ............................................................ 19

*United States v. Reese*

  (9th Cir. 1993) 2 F.3d 870 ............................................................... 33

*Warden, Md. Penitentiary v. Hayden*

  (1967) 387 U.S. 294 ........................................................................ 22

*Wilkinson v. Torres*

  (9th Cir. 2010) 610 F.3d 546 ............................................................ 28

*Wilson v. Layne*

  (1999) 526 U.S. 603 ........................................................................ 26

*Winarto v. Toshiba Am. Elecs. Components, Inc.*

  (9th Cir. 2001) 274 F.3d 1276 .......................................................... 32



ALVAREZ-GLASMAN & COLVIN

ATTORNEYS AT LAW



**Statutes**

42 U.S.C. section 12132 ........................................................................12

42 U.S.C. section 1983 ....................................................................passim

California Civil Code section 52.1 ................................................12, 32

California Civil Code section 52.1(a) ..................................................32

California Code of Civil Procedure section 377.60 ............................12

California Code of Civil Procedure section 377.61 ............................12

Federal Rules of Civil Procedure Rule 56(a) ......................................18

Federal Rules of Civil Procedure Rule 56(e) ......................................18

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   PROCEDURAL HISTORY:

This action arose out of the officer involved fatal shooting of Desmond Phillips, on March 17, 2017, by Defendant Officers Jeremy Gagnebin ("Gagnebin") and Alex Fliehr ("Fliehr") of the Chico Police Department.  Plaintiffs' complaint alleges nine claims:  (1) 42 U.S.C. § 1983, Survival action, Excessive force; (2) 42 U.S.C. § 1983, Survival action, denial of medical care; (3) 42 U.S.C. § 1983, Fourteenth Amendment claim for loss of familial companionship brought by Plaintiffs David Phillips and Delphine Norman as co-successors in interest to decedent; (4) 42 U.S.C. § 1983, Municipal Liability for Unconstitutional Custom or Policy–*Monell*; (5) California Code of Civil Procedure sections 377.60 and 377.61, Wrongful death – Negligence; (6) Violation of California Civil Code section 52.1; (7) Negligence; (8) Title IV of the Americans with Disabilities Act – 42 U.S.C. § 12132; and, (9) Negligent infliction of emotional distress.

Defendants, by way of this motion, seek the dismissal of all nine claims alleged in the complaint, or in the alternative, partial summary adjudication of issues.  Plaintiffs will not be filing a cross-motion.  (Colvin Decl.).

## II.   FACTUAL SUMMARY:

On March 17, 2017, at approximately 7:15 p.m., Chico Police Officers Jared Cumber ("Cumber"), Jeremy Gagnebin ("Gagnebin") and Alex Fliehr ("Fliehr"), while on duty and in uniform, were involved in a call for service to assist Chico Fire Department and Butte County EMS personnel with an uncooperative, hostile and probable 5150 subject, Desmond Phillips, a 25-year old male. ("Desmond"). (Defendants' Statement of Undisputed Facts (hereinafter "UF")).  (UF# 1).  The location of the call for service was 725 West 4th Avenue, Apartment #3, Chico, California.  Officers Cumber and Gagnebin were dispatched to assist.  (UF# 2). Fliehr arrived at the scene because he heard Cumber via his earpiece request a third unit to respond to the West 4th Avenue location.  (UF# 3).

12

Upon arrival, Cumber made contact with fire personnel who informed him that they were at the location initially for a possible seizure disorder involving Desmond, but that upon contact, Desmond became combative while attempting to provide assistance. (UF# 4). As a result, fire personnel and EMS left the apartment and contacted Chico Police Department.  Cumber was informed after fire personnel had left the apartment, that Desmond had a history of 5150 or mental health.  (UF# 5). Gagnebin received information from dispatch before arrival at the scene that the service call was a probable 5150 and involved a person who was uncooperative. (UF# 6).

Prior to Cumber, Gagnebin and Fliehr's arrival, Desmond's father, David Phillips ("Phillips"), who was located inside the apartment with Desmond, contacted Chico Police dispatch via a 911 call wherein he told the dispatch operator that Desmond had tried to stab him and that he was locked in a room and that his two grandchildren were locked in another room of the apartment.  (UF# 7).

Phillips informed Chico police dispatch that he wasn't able to exit the apartment and that he threatened to shoot Desmond. (UF# 8).

In this same 911 call, Phillips told the 911 operator, "He's trying to kick the door in. He's trying to stab me now." (UF# 9). This information was communicated via radio dispatch to Gagnebin, Cumber and Fliehr prior to the officers entering the apartment to confront Desmond and prior to shooting him.  (UF# 10).  Upon arrival, Gagnebin spoke to fire and EMT personnel who told him that Desmond had armed himself with a lamp and was hostile to them.  (UF# 11).

Gagnebin, while at the location and prior to entering into the apartment, heard via radio dispatch that Desmond was trying to stab Phillips. (UF# 12). Gagnebin Depo, 45:22-25; 46:1-5).  Cumber, before entering into the apartment, was informed via dispatch that Phillips was in one of the bedrooms, couldn't get out and that Desmond was trying to break down the door and stab Phillips.  (UF# 13).

Fliehr, while at the scene and prior to entering into the apartment, was

13

informed via dispatch that Desmond was trying to break down the door and stab Phillips.  (UF# 14).

After receiving this information, Cumber, while outside the apartment, but looking into the front door into the apartment, a second time, initially saw Desmond pacing in front of a kitchen counter and observed that Desmond had at one point one knife in each hand.  (UF# 15).

Cumber described the knife as looking like an average size steak knife, with a shiny blade.  (UF# 16). Cumber advised dispatch that Desmond had a knife in his hand and that after doing so, he saw that Desmond had two knives in his hand. (UF# 17).

Gagnebin, while at the front door and before entering the apartment, saw Desmond holding two kitchen knives, with blades approximately 5 to 8 inches in length.  (UF# 18).

While at the front door prior to entering into the apartment, Gagnebin initially spoke to Desmond from outside the apartment, telling Desmond that he and the other officers were Chico police and they were not there to hurt Desmond and that they wanted to get him help. (UF# 19). Gagnebin repeated these statements to Desmond more than ten (10) times. (UF# 20). Gagnebin also called Desmond by his first name, to try to get Desmond to talk. (UF# 21).

Fliehr, while at the front door and prior to entering into the apartment, initially heard voices coming from inside the apartment, which he described as some type of verbal argument. (UF# 22). Fliehr also heard pounding from inside the apartment and saw windows of the apartment kind of shudder from the pounding. (UF# 23).   Fliehr, prior to entering the apartment, saw Desmond inside the apartment holding two large kitchen knives, one in each hand.  (UF# 24).

Fliehr saw Desmond close the front door to the apartment.   (UF# 25). A perimeter was established where Fliehr went to the front door with Cumber and Gagnebin. Later arriving officers, (Ament and Martin), were dispatched to the rear

ALVAREZ-GLASMAN & COLVIN
ATTORNEYS AT LAW

of the apartment. (UF# 26). Once Officer Martin reached the rear area of the apartment, Officer Martin broadcast that there was a 415 or a verbal altercation going on inside the apartment. (UF# 27). After Desmond closed the door, Fliehr heard a verbal argument from inside the apartment and he could also see loud thudding, causing the apartment windows to bulge out with each thud. (UF# 28).

While at the front door and after Desmond had closed the front door, Chico Police Sgt. Mike Williams ("Williams") approached Fliehr. (UF# 29). Prior to Williams' arrival, Cumber, Gagnebin and Fliehr came up with a tactical plan of entering into the apartment. (UF# 30). Cumber, who had a taser, told Gagnebin and Fliehr that once Desmond presented himself to be a good target, that he (Cumber) would attempt to use the taser first before the officers did anything else. (UF# 31). Cumber was going to deploy the taser because he believed that Desmond was a threat at that point. (UF# 32). The plan in deploying the taser was to incapacitate Desmond temporarily so that he could be detained and handcuffed. (UF# 33).

After devising this plan, Gagnebin, Fliehr and Cumber were outside the apartment, near the front door. Moments prior to forced entry into the apartment, the information known by these officers was that Desmond was trying to kick down a door inside the apartment in order to stab Phillips. (UF# 34). Prior to the door being kicked open, Fliehr had concern that this was an exigent hostage rescue scenario because there was information received via radio that Desmond was trying to stab Phillips. (UF# 35).

Fliehr was worried for the safety of Phillips as well as the children inside the apartment. (UF# 36). Williams ordered the officers to enter the apartment by yelling, "Go." (UF# 37). Fliehr kicked open the front door. (UF# 38). After the front door flew open, Cumber saw Desmond standing directly inside the door with his left shoulder up against the door jamb. (UF# 39). Officers Gagnebin and Fliehr saw Desmond standing by the door, with two knives. (UF# 40).

Cumber deployed the taser, one time, aiming the taser barbs at Desmond's

15

center mass of his torso.  (UF# 41).  Prior to deploying the taser, Cumber stated "Taser, taser, taser" as a warning.  (UF# 42). One probe hit Desmond's chest area and one barb hit Desmond's waistband.  (UF# 43).  After being hit by the taser, Desmond fell to the ground inside the apartment, face down on his chest.  (UF# 44).

After Desmond had fallen from being struck by the taser, Fliehr entered the apartment, initially looking for the knife and Desmond's arm.  (UF# 45). Fliehr saw the knife and Desmond's hand and was in the process of going to step on either the knife, or kick it out of the way.  (UF# 46).

Before Fliehr could either step or kick the knife away, Desmond started to stand up, causing Fliehr to believe that the taser was no longer effective.  (UF# 47). Fliehr saw Desmond stand up and start to run at him and Officer Gagnebin with a knife in each hand.  (UF# 48). Fliehr retreated back into the apartment to allow Gagnebin to retreat as well. (UF# 49). Desmond ran toward Fliehr and Gagnebin with two knives, swinging them in a slashing type motion, like he was swimming. (UF# 50). Fliehr saw Desmond holding one of the knives with the blade up, blade toward the thumb.  (UF #51).

Gagnebin saw Desmond get up, bend down, and pick an item off the floor. Gagnebin couldn't see Desmond's hands. (UF #52).  After picking up this object, Gagnebin saw Desmond start to advance towards him, swinging both arms over his head in a downward slashing motion.  (UF# 53). Gagnebin described the object that Desmond was swinging as something that came to a point with a metallic piece on it.  (UF# 54). Gagnebin couldn't recall if Desmond was holding anything in his other hand because he was focusing on the one hand holding the metal object.  (UF # 55).

When Desmond stood up, he turned away from Cumber and Cumber could only see his back and his arms.  (UF# 56).  Cumber could not see Desmond's hands because Desmond's body was in the way, but Cumber could see Desmond making a slashing, swinging motion sideways.  (UF# 57). While Desmond was making the

16

slashing motion, Cumber was attempting to reload his taser, to deploy the taser a second time. (UF# 58). While Cumber was reloading his taser, he heard gunshots. (UF# 59).

When Desmond started to lean forward as if to bull rush toward Fliehr, Fliehr was in fear of his life and great bodily harm to himself and Gagnebin and discharged his weapon. (UF# 60). Fliehr formed the belief that he had to protect himself from Desmond. (UF# 61). Fliehr formed the belief that Desmond was trying to stab and kill him and his partner. (UF# 62).

As Desmond was on his feet, leaning forward like he was going to bull rush Fliehr and Gagnebin, Fliehr moved backwards in order to create space and when Desmond was approximately 2 to 8 feet away from Fliehr, he started to fire his gun at Desmond, shooting him 9 times. (UF# 63).

Fliehr shot Desmond because Fliehr wanted to eliminate the threat that Desmond presented to Gagnebin and himself, the imminent threat of great bodily injury or death. (UF# 64). Once the threat no longer existed, Fliehr ceased firing. (UF# 65). Desmond was running at Fliehr, swinging the knives. It was at this time that Fliehr started shooting at Desmond. (UF# 66).

Gagnebin made the decision to shoot Desmond as Desmond was moving quickly towards him making stabbing motions with his arm. (UF# 67). Gagnebin made the decision to shoot Desmond because he was in fear for his life and Fliehr's life and because Desmond was moving quickly towards him. (UF# 68). Gagnebin fired at Desmond while Desmond was on his feet. (UF# 69). Gagnebin estimated that Desmond took approximately between five to 15 steps forward towards him while Desmond was on his feet and being shot. (UF# 70). Desmond was approximately between one to five feet away from Gagnebin when Gagnebin started firing. (UF# 71).

Officer Cumber saw Desmond rush at Fliehr and Gagnebin, but did not see any knives in Desmond's hands because he never saw his hands. (UF# 72). After

17

1   Desmond stood up after being tased, Cumber lost vision once the gunshots started

2   because Desmond's back was facing him after Desmond got up. (UF# 73).  Cumber

3   saw Desmond's arms moving side to side, in a slashing motion as he stood up and

4   rushed towards Fliehr and Gagnebin. (UF# 74).  Cumber could not see Desmond's

5   hands at this time.  (UF# 75).

6        After the shooting, Phillips exited a bedroom inside the apartment and made

7   contact with Fliehr after Fliehr stopped shooting. (UF# 76). The officers were then

8   sequestered and were interviewed regarding the incident.  (UF# 77).

9   **III.    THE LEGAL STANDARD GOVERNING MOTIONS FOR**

10         **SUMMARY JUDGMENT:**

11        A court will grant summary judgment "if . . . there is no genuine dispute as to

12   any material fact and the movant is entitled to judgment as a matter of law."  Fed.

13   R. Civ. P. 56(a).  The moving party bears the initial burden of showing the district

14   court "that there is an absence of evidence to support the nonmoving party's case."

15   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

16        Once the moving party meets its initial burden, the burden shifts to the non-

17   moving party to "designate 'specific facts showing that there is a genuine issue for

18   trial.'"  *Id*. at 324 [quoting then-Fed. R. Civ. P. 56(e)].  To carry this burden, the

19   non-moving party must "do more than simply show that there is some metaphysical

20   doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*

21   475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be

22   insufficient; there must be evidence on which the jury could reasonably find for the

23   [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S., 242, 252 (1986).

24   Only disputes over facts that might affect the outcome of the suit under the

25   governing law will properly preclude the entry of summary judgment.  *Id*. at 247-

26   48. Conclusory, speculative testimony in affidavits and moving papers is

27   insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls*

28   *Riverway Realty, Inc. v. Niagara Falls*, et al., 754 F.2d 49, 56 (2d Cir. 1985);

ALVAREZ-GLASMAN & COLVIN
ATTORNEYS AT LAW

18

*Thornhill Pub. Co., Inc. v. General Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

With the aforementioned legal principles in mind, and as explained in further detail below, Defendants submit that the undisputed material facts establish that they are entitled to judgment in their favor on the entirety of the Complaint.

## IV.    LEGAL ANALYSIS:

### A.    DEFENDANT OFFICERS' USE OF DEADLY FORCE WAS OBJECTIVELY REASONABLE UNDER THE CIRCUMSTANCES

Whether analyzed under the objective reasonableness standard established by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989), or in terms of qualified immunity, the undisputed facts established that the individual officers are entitled to summary judgment with respect to Plaintiffs' use of force claim.

All claims that law enforcement officers have used excessive force, deadly or not, in the course of an arrest, investigatory stop, or other "seizure" are analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor,* 490 U.S. 386, 395 (1989).  Determining whether the force used to effect a particular seizure is "reasonable" requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. The "most important" factor under *Graham* is whether the suspect posed an "immediate threat to the safety of the officers or others."  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense,

uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. *Id*. at 396-97. The salient question is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him/her. *Id*. at 397. The reasonableness inquiry as to a police officer's actions is without regard to the officer's good or bad motivations or intentions. *Id*. Importantly, the "least amount of needed force" is not the legal standard; officers need only act within that range of conduct identified by the Courts as reasonable. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). As observed by the Ninth Circuit, imposing such a requirement would inevitably induce tentativeness by officers, and thus deter police from protecting the public *and themselves.* It would also entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment. Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable. *Id*. Moreover, threatening an officer with a weapon does justify the use of deadly force. *See Smith*, 394 F.3d at 704; *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996).

Significantly, where a police officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others, *it is not constitutionally unreasonable to prevent escape by using deadly force*. *Tennessee v. Garner,* 471 U.S. 1, 11 (1985).

Applying the *Graham* factors to this case, it becomes abundantly clear that the amount of force used by Fliehr, Gagnebin and Cumber during this incident was objectively reasonable as a matter of law. The undisputed facts are:

1. On March 17, 2017, the City of Chico Police Department's dispatch center received a 911 call from Desmond's father, David Phillips, ("Phillips") who stated to the 911 operator that Desmond was trying to kick the door in and that Desmond was trying to stab him now. (UF# 9).

20

2.     Fliehr, Gagnebin and Cumber arrived at the scene and from the outside looking in, could see Desmond through a partially open front door, pacing back and forth with either one knife or two kitchen knives in his hands. (UF## 15, 17, 18).

3.     Upon arrival at the scene and before entering into the apartment, Gagnebin communicated with Desmond by telling him that the officers were Chico police, that the officers were not there to hurt him and that the officers wanted to get him help.  Gagnebin repeated these commands more than 10 times.   (UF## 19, 20).

4.     While near the front door and before entry into the apartment, Gagnebin, Fliehr and Cumber formulated a tactical plan.  According to the plan, upon entry into the apartment, once Desmond presented himself, Officer Cumber, who had a taser, would attempt to tase Desmond before the officers did anything else.  (UF## 30, 31).

5.     Upon forced entry into the apartment, Desmond was standing inside the door, near the door frame. (UF# 39).

6.     Upon entering into the apartment by Fliehr and Gagnebin, Cumber deployed his taser, sending a probe which struck Desmond in the center upper chest, causing him to fall. (UF# 41) Prior to deploying the taser, Cumber yelled "Taser, taser, taser."  This was the way it is per policy.  (UF# 42).

7.     After Desmond fell, Fliehr approached Desmond, who was on the floor, with the intent to step on the knife or kick it out of the way. (UF# 46).

8.     As Fliehr and Gagnebin approached, Desmond suddenly stood up and Fliehr saw Desmond start to run at him and Gagnebin with a knife in each hand. (UF# 48).

9.     Gagnebin saw Desmond stand up, and reach back down to pick up an object which resembled something that came to a point. (UF## 52, 53, 54).

10.     As Desmond started to run towards Fliehr and Gagnebin with the knives and pointed object, Desmond was swinging his arms in a slashing motion. (UF## 48, 49, 50, 53, 63).

21

11.     When Desmond ran toward Fliehr with knives, Fliehr formed the belief that Desmond was trying to stab him and kill him and Gagnebin.  (UF# 62).

12.     In order to defend himself, Fliehr shot Desmond who was running at him swinging the knives.  (UF# 66).

13.     Gagnebin saw Desmond moving quickly towards him carrying a pointed object and Gagnebin decided to shoot him because he was in fear for his life. (UF## 67, 68).  Desmond was approximately between one to five feet away from Gagnebin when Gagnebin started firing.  (UF# 71).

The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay "would gravely endanger their lives or the lives of others." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-299 (1967).

Once Desmond closed the front door, with knowledge that there were third parties inside the apartment including minor children, together with threats communicated to them that Desmond was kicking down the door and was attempting to stab his father, exigency existed for immediate entry.  Based upon these objective factors, these officers did not violate any federal or state right when they forced entry into the apartment.

After entering, the officers saw Desmond holding knives, deadly weapons, and had immediate concern for their own safety.  Instead of initiating initial gunfire, Cumber used less lethal force by tasing Desmond.  (UF## 41, 42).  After being tased, Desmond stood up and charged at the officers with either knives or a sharp object creating an immediate, objective, reasonable fear that Desmond was either going to kill them or inflict grave bodily harm. (UF## 47, 48, 49, 50, 52, 53, 54, 60, 61, 62, 64, 65, 66, 67, 68).  At this point, the officers opened fire.  The use of force was justified.  *See Scott v. Harris*, 550 U.S. 372, 384 (2007).  Nothing in the Fourth Amendment barred Gagnebin and Fliehr from protecting themselves, even if it meant firing multiple rounds.  *See Plumhoff v. Rickard*, 572 U.S. 765 (2014).

As tragic as the death of Desmond is, it cannot be disputed that the

ALVAREZ-GLASMAN & COLVIN
ATTORNEYS AT LAW

immediate threat of a charging, violent individual with knives swinging warranted the use of deadly force and the officers' decision to use deadly force was objectively reasonable as a matter of law.   As such, the Court should dismiss Plaintiffs' Fourth Amendment excessive force claim.

**B.    INDIVIDUAL DEFENDANT OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY (THE FIRST, SECOND, THIRD, FOURTH, AND EIGHTH CLAIMS FOR RELIEF)**

Apart from the undisputed facts of the case that no constitutional violations occurred, the individual Defendant officers are nonetheless entitled to qualified immunity with respect to all federal claims.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) quoting *Harlow v. Fitzgerald*, 457 U.S. 880, 818 (1982); *See also Hughes v. Kinsela*, 841 F.3d 1081, 1088 (9th Cir. 2016); *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001).  When a court is presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The United States Supreme Court has held that "while the sequence set forth therein is often appropriate, it should no longer be regarded as mandatory."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  In this regard, if a court decides that Plaintiffs' allegations do not make out a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity."  *Saucier*, 533 U.S. at 201.  Likewise, if a court determines that the right at issue was not clearly established at the time of the defendant's alleged misconduct, the court may end further inquiries concerning

ALVAREZ-GLASMAN & COLVIN
ATTORNEYS AT LAW

1    qualified immunity at that point without determining whether the allegations in fact

2    make out a statutory or constitutional violation. *Pearson*, 555 U.S. 236-42.  As

3    already discussed above, there is insufficient evidence before the court on summary

4    judgment for a reasonable trier of fact to return a verdict in Plaintiffs' favor on the

5    excessive force claim based on the shooting of Desmond.  Assuming arguendo that

6    there was a violation, the court must only determine whether the law with respect to

7    that excessive force claim was clearly established at the time of this incident in

8    March 2017.

9       "A Government official's conduct violate[s] clearly established law when, at

10   the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently

11   clear' that every 'reasonable official would have understood that what he is doing

12   violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2001) (quoting

13   *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Hope v. Pelzer,* 536

14   U.S. 730, 739 (2002); *A.D. v. California Highway Patrol*, 712 F.3d 446, 454-55

15   (9th Cir. 2013).  In this regard, "existing precedent must have placed the statutory

16   or constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741; *see also*

17   *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) ("The proper inquiry focuses

18   on . . . whether the state of the law [at the relevant time] gave 'fair warning' to the

19   officials that their conduct was unconstitutional.") (quoting *Saucier*, 533 U.S. at

20   202).  The inquiry must be undertaken in light of the specific context of the

21   particular case. *Saucier*, 533 U.S. at 201.  Accordingly, Fliehr, Gagnebin and

22   Cumber would be entitled to qualified immunity if, in light of the law and the same

23   factual scenario, a reasonable officer could have believed that his/her conduct was

24   lawful.  *See Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993).

25       Here, construing the evidence before the court in favor of the Plaintiffs, a

26   reasonable officer would have understood that deploying taser first, with a warning

27   and applying deadly force in this situation was not unconstitutional.

28       The facts are uncontroverted that Desmond was armed with either a knife,

ALVAREZ-GLASMAN & COLVIN
ATTORNEYS AT LAW

knives or a sharp object, was posing a danger to not only the officers, but his father and minor children in the apartment, by making threats to kick in a door and stab Phillips.  In fact, the evidence is that Phillips informed 911 dispatch that "He's trying to stab me now" and that he made the threat to "shoot" Desmond, creating an inference that he had a loaded gun in the apartment. (UF## 7, 8, 9, 10).

When the officers entered the apartment, Desmond quickly rushed towards the officers with a knife/knives or sharp object, the officers reasonably believed that they faced the immediate threat of death or serious bodily injury, necessitating the use of deadly force.  A reasonable officer in this situation would have understood that applying deadly force in this situation was not unconstitutional.  As such, Gagnebin, Fliehr, Cumber, and City are entitled to qualified immunity as to all the federal claims.

### C.   PLAINTIFFS' "ADA" CLAIM AND QUALIFIED IMMUNITY

Plaintiffs claim that Defendants City, Gagnebin, Fliehr, and Cumber violated Title II of the Americans with Disability Act by subduing Desmond in a manner that did not reasonably consider or accommodate his disability.  (Complaint ¶¶ 35, 104, 105, and 106).

To state a claim under Title II of the ADA, a plaintiff must allege: "(1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and, (4) such exclusion, denial of benefits, or discrimination was by reason of [his] disability."  *O'Guinn v. Lovelock Corr. Ctr.,* 502 F.3d 1056, 1060 (9th Cir. 2007).

Plaintiffs allege that Gagnebin, Fliehr and Cumber failed to take into consideration "decedent's obvious mental impairment" prior to the use of force. (Complaint, ¶ 35).  Plaintiffs also allege that Gagnebin, Fliehr and Cumber

25

1  "intentionally and/or with deliberate indifference disregarded decedent's disability

2  and the necessary accommodations."  (Complaint ¶ 105).

3       The ADA issue raised here is whether a mentally ill person who is armed

4  with a weapon and presents an immediate threat to the officers or others (as was the

5  case with the decedent) is entitled to an accommodation under ADA prior to being

6  detained and/or taken into custody.

7       In *City and County of San Francisco, Cal., v. Sheehan*, 135 S.Ct. 1765 (2015)

8  the Supreme Court was faced with the issue of "exigency" involving a mentally ill

9  person who was armed with a weapon and presented an immediate threat and the

10  entitlement to accommodation under the ADA.  In *Sheehan*, the Supreme Court,

11  after lengthy discussion, did not decide whether a mentally ill person who was

12  arrested and presented an immediate threat was entitled to accommodation.  The

13  Supreme Court left unresolved whether law enforcement officers must "reasonably

14  accommodate" dangerous, mentally ill individuals.  *Id.* at 1774.  The Supreme

15  Court did address, however, a second question as to whether the individually named

16  officers were entitled to qualified immunity.

17       Here, even assuming that there was a failure by Gagnebin, Fliehr and Cumber

18  to provide accommodations to Desmond under Title II of the ADA, these officers,

19  under the analysis in *Sheehan*, would be entitled to qualified immunity because the

20  constitutional right asserted was not clearly established in 2017.

21       "Clearly established," for purposes of qualified immunity, means that "the

22  contours of the [constitutional] right must be sufficiently clear that a reasonable

23  official would understand that what he is doing violates that right; this is not to say

24  that an official action is protected by qualified immunity unless the very action in

25  question has previously been held unlawful, but it is to say that in the light of pre-

26  existing law its unlawfulness must be apparent."  *Wilson v. Layne*, 526 U.S. 603,

27  614-15 (1999).  This analysis is objective and is considered in light of the specific

28  factual circumstances of each case.  *See Brittain v. Hansen*, 451 F.3d 982, 987 and

ALVAREZ-GLASMAN & COLVIN

ATTORNEYS AT LAW

26

988 (9th Cir. 2006).  Accordingly, the officers' conduct would be entitled to qualified immunity, if, in light of the law and the same factual scenario, a reasonable official could have believed her conduct was lawful.  *See Act Up!/Portland*, 988 F.2d at 871.

Qualified immunity is an affirmative defense upon which Defendants ultimately bear the burden of proof.  *See Eng v. Cooley*, 552 F.3d 1062, 1075 (9th Cir. 2009).  However, Plaintiffs bear the initial burden to establish that the constitutional right at issue was clearly established at the time of the alleged violation. As stated, the Supreme Court has held that failure of officers to follow their training with respect to emotionally disturbed subjects would not deprive them of qualified immunity.  *Id.*

Clearly, here, the conduct of Gagnebin, Fliehr and Cumber would not place any reasonably competent officer on notice that it was unreasonable to forcibly enter the apartment of an armed, mentally ill suspect who had been acting irrationally and had threatened to kick in the door and stab his father.  Even assuming that the conduct was unreasonable to a reasonable officer, there was no precedent clearly established that there was no objective need for forced entry and use of deadly force to a violent suspect with knives.  In light of the existing law, without "fair notice" to these officers that their conduct violated the law, the individual officers are entitled to qualified immunity under the ADA claim.  Notably, in *Sheehan*, under very similar circumstances, the Supreme Court did grant qualified immunity stating that because the law was not clearly established that the officers had to accommodate the Plaintiff's disability with a difficult response, the officers were entitled to qualified immunity.  *City and County of San Francisco, Cal*., 135 S.Ct. at 1778.  Plaintiffs' ADA claim should be dismissed as a matter of law because Cumber, Gagnebin and Fliehr are entitled to qualified immunity.

///

///

1

2

3

4

5

**D.    SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM BECAUSE  CHICO OFFICERS DID NOT ACT WITH A SUBJECTIVE PURPOSE TO CAUSE HARM UNRELATED TO THE LEGITIMATE OBJECT OF ARREST**

6

7

8

9

It is well established that a parent has a "fundamental liberty interest" in "the companionship and society of his or her child," and that [t]he state's interference with the liberty interest without due process of law is remedial under 42 U.S.C. § 1983." *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985).

10

11

12

13

14

15

To establish a constitutional substance due process violation, the officers' conduct must "shock [ ] the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  In determining whether excessive force shocks the conscience, the first inquiry is "whether the circumstances are such that actual deliberation [by the officer] is practical." *Id.* (citing *Moreland v. Las Vegas Metro. Police Dep't.*, 159 F.3d 365, 372 (9th Cir. 1998) (internal quotation marks omitted)).

16

17

18

19

20

21

22

23

24

25

26

27

28

Where actual deliberation is practical, an officer's "deliberate indifference" may suffice to shock the conscience.  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).  The deliberate indifference standard requires that "a person . . . 'consciously disregar[d]' a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 839 (1994).  On the other hand, where a law enforcement officer makes a snap judgment in an escalating situation, "h[er] conduct may only be found to shock the conscience if [s]he acts with a purpose to harm [the decedent] unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554.  Under the purpose or intent to harm standard, the court looks at the totality of the circumstances to assess whether a jury could reasonably infer any of the officers were acting for purposes other than legitimate law enforcement.  *Porter*, 546 F.3d at 1141.  Plaintiffs have the burden to establish that the executive abuse of power that provides the basis for the action "shocks the conscience." *County of Sacramento v.*

ALVAREZ-GLASMAN & COLVIN

ATTORNEYS AT LAW

*Lewis*, 523 U.S. 833, 846-47 (1998).  The pending issue here is whether officers Fliehr, Cumber and Gagnebin acted with deliberate indifference or a more demanding showing that they acted with a purpose to harm the decedent unrelated to a legitimate law enforcement objective.  *Porter*, 546 F.3d at 1137.  In order to meet their burden of establishing that the officers acted with a "purpose to harm unrelated to a legitimate law enforcement objective," Plaintiffs must produce factual evidence to show the officers had an ulterior motive for using force against Desmond.  *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797-98 (9th Cir. 2014).

Fliehr, Cumber and Gagnebin saw Desmond with a knife(s). Desmond, instead of obeying lawful orders, created a tense rapidly unfolding situation in which he continued to brandish a deadly weapon in close proximity to the officers. This, together with the information that Desmond's own father stated that he was about to be "stabbed now," while in a room in the apartment with minor children, left officers Gagnebin and Fliehr no choice but to address the immediacy of the threat.  *See Hayes v. City of San Diego Co.*, 736 F.3d 1223, 1230 (9th Cir. 2013). This was a rapidly escalating situation with credible threats from a father concerning his son about to stab him.  The officers did not act with deliberate indifference.  The immediate exigency of the situation involving life and death situations inside the small apartment demanding immediacy created the situation. Gagnebin, Fliehr and Cumber were aware of facts which the inference could be drawn that a substantial risk of serious harm existed.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Simply put, there was no deliberate indifference based upon the facts and Plaintiffs' Fourteenth Amendment substantive due process claims should be dismissed.

///

///

///

///

E.   **PLAINTIFFS CANNOT STATE A CLAIM FOR NEGLIGENCE, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS OR VIOLATION OF THE BANE ACT BECAUSE THE AMOUNT OF FORCE UTILIZED BY THE OFFICERS WAS OBJECTIVELY REASONABLE**

   1.   **Negligence Claim:**

As to Plaintiffs' negligence claim, a plaintiff must show that the Defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury. *Hayes*, 57 Cal.4th at 629.  Duty is a critical element of negligence liability. *Id.*  California courts have long recognized that peace officers have a duty to act reasonably when using deadly force. *Id.*

To determine reasonableness, state negligence law, like the Fourth Amendment reasonableness test, requires a consideration of the totality of the circumstances surrounding any use of deadly force. *Id.*

In *Hayes*, 57 Cal.4th at 639, the court stated that "an officer's tactical conduct and decisions preceding the use of deadly force are relevant considerations in determining whether the use of deadly force give rise to negligence liability, which could arise for example, if the tactical conduct and decisions that the use of deadly force was unreasonable."

As fully explained in connection with Plaintiffs' excessive use of force claim, the pre-shooting conduct, and the amount of force utilized by the officers during the incident was objectively reasonable and did not violate Desmond's Fourth Amendment rights.

In this case, the undisputed facts clearly establish that exigent circumstances necessitated forced entry into the apartment in order to subdue a dangerous individual holding knives and threatening to kick in the door of a bedroom to stab his father, an undisputed fact confirmed by Plaintiff Phillips.

It is also undisputed that a tactical plan was devised prior to entry, and that


ALVAREZ-GLASMAN & COLVIN
ATTORNEYS AT LAW

1     de-escalation commands to exit the apartment did not work. (UF## 19, 20, 21, 30,

2     31, 32, 33).

3         Desmond was armed, violent and made threats to stab his own father.  The

4     use of force in this scenario as well as the tactical conduct and decisions preceding

5     the use of deadly force were reasonable under the totality of the circumstances,

6     thus, necessitating dismissal of Plaintiffs' negligence claim as a matter of law.

7         Lastly, Plaintiffs may argue that Gagnebin, Fliehr and Cumber intentionally

8     or negligently provoked the confrontation with Desmond prior to the shooting.

9     Under Ninth Circuit precedent, *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2001),

10    if an officer intentionally provokes violent confrontation, and provocations is an

11    independent Fourth Amendment violation, the officer may be held liable for an

12    otherwise use of deadly force in self-defense.

13        In *County of Los Angeles v. Mendez*, 137 S.Ct. 1539, 1548, fn. (2017), the

14    Supreme Court rejected the Ninth Circuit's "provocation" rule by stating that "once

15    a use of force is deemed reasonable under *Graham*, it may not be found

16    unreasonable by reference to some separate constitutional violation."

17        **2.**     <u>**Negligent Infliction of Emotional Distress**</u>

18        Plaintiffs' Ninth Cause of Action seeks recovery of damages based upon a

19    claim of negligent infliction of emotional distress.

20        Where a tortious act causes emotional distress without any concurrent

21    physical injury, the plaintiff may recover emotional distress damages under the

22    negligent infliction of emotional distress claim. *See Marlen F. v. Affiliated*

23    *Psychiatric Medical Clinic, Inc.*, 48 Cal.3d 583, 590 (Cal. 1989); *Spates v.*

24    *Dameron Hosp. Assn.*, 114 Cal.App.4th 208, 213 (3d Dist. 2003).  However,

25    negligent infliction of emotional distress is not an independent tort, but the tort of

26    negligence to which the traditional elements of negligence cause of action apply.

27    *Christensen v. Superior Court*, 54 Cal.3d 868, 884 (Cal. 1991); *Macy's California*

28    *Inc. v. Superior Court*, 41 Cal.App.4th 744, 748 (1st Dist. 1995). Thus, to support

ALVAREZ-GLASMAN & COLVIN
ATTORNEYS AT LAW

1    relief, the defendant must owe a duty to the plaintiff that is assumed by the

2    defendant or imposed on the defendant as a matter of law, or that arises out of a

3    relationship between the two. *Burgess v. Superior Court,* 2 Cal.4th 1064, 1073

4    (Cal. 1992); *Plotnik v. Meihaus*, 208 Cal.App.4th 1590, 1608 (4th Dist. 2012),

5    review denied, (Dec. 12, 2012).

6       Negligent infliction of emotional distress claims include two distinct

7    common law "negligent infliction" theories, either one of which may support

8    liability in an appropriate case.

9       If the Court finds that the amount of force by the officers was objectively

10   reasonable as argued in *Hayes v. City of San Diego*, 57 Cal.4th 622, Plaintiffs'

11   negligence infliction claim should also be dismissed.

12      **3.**     <u>**Plaintiffs' Bane Act Claim Should be Dismissed Because the**</u>

13          <u>**Amount of Force by the Officers was Objectively Reasonable:**</u>

14       The Bane Act prohibits any person from interfering by "threat[s],

15   intimidation or coercion . . . with the exercise or enjoyment by an individual . . . of

16   rights secured by the Constitution . . . ." Cal. Civ. Code § 52.1(a).  Section 52.1

17   claims differ from § 1983 claims in that section 52.1 also requires independent

18   evidence of threats, intimidation, or coercion.  *See Malott v. Placer County*, No. 14-

19   1040, 2016 WL 538462, at *7 (E.D. Cal. Feb. 11, 2016).  In evaluating the

20   threatening or coercive conduct, the court must consider whether "a reasonable

21   person, standing in the shoes of the plaintiff, [would] have been intimidated by the

22   actions of the defendant and have perceived a threat of violence." *Winarto v.*

23   *Toshiba Am. Elecs. Components, Inc*., 274 F.3d 1276, 1289-90 (9th Cir. 2001).  A

24   plaintiff cannot attempt to satisfy two distinct elements by establishing only one.

25   e.g. an unlawful or unconstitutional act. *Malott*, 2016 WL 538462 at *7.  Notably,

26   liability under the Bane act requires an officer to have had "a specific intent to

27   violate the arrestee's right to freedom from unreasonable seizure." *Reese v. City of*

28   *Sacramento,* 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting *Cornell v. City and City*

ALVAREZ-GLASMAN & COLVIN

ATTORNEYS AT LAW

*of Sacramento*, 17 Cal.App.5th 766, 802 (Ct. App 2017).  Evidence simply showing that an officer's conduct amounts to a constitutional violation under an "objectively reasonable" standard is insufficient to satisfy the additional intent requirement under the Bane Act. *Reese*, 888 F.3d at 1045. Here, Plaintiffs must show that the officers "intended not only the force, but its unreasonableness, its character as 'more than necessary under the circumstances.'" *See Id.* (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993).  Plaintiffs have proffered no such evidence requiring a dismissal of the Bane Act as a matter of law.

> ### F.   DEFENDANTS' CONDUCT IN RENDERING MEDICAL AID/TREATMENT WAS REASONABLE UNDER THE FOURTH AMENDMENT AND IS BARRED BY QUALIFIED IMMUNITY

Plaintiffs allege that denial in medical care by Defendants post-shooting amounted to a deprivation of decedent's right to be secure in his person against unreasonable search and seizures. (Complaint 12:16:27).

The Fourth Amendment requires police officers to provide "objectively reasonable post-arrest medical care" until the end of a seizure. *Estate of Cornejo ex rel. Solis v. City of Los Angeles*, 618 Fed.Appx. 917, 920 (9th Cir. 2015).  Courts "analyze both claims of excessive force and failure to render post-arrest medical treatment under the same reasonableness standard of the Fourth Amendment." *Ostling v. City of Bainbride Island*, 872 F.Supp.2d 1117, 1129, (W.D. Wash. 2012) (citing Graham, 490 U.S. at 395.)

Here, the facts are undisputed that the Fire Department and EMT were located immediately outside the apartment at the time the shots were fired. (Brose Decl.). After the shots were fired, Chico Fire Captain Brose, after receiving Defendant officers' call for assistance, entered back into the apartment, where Desmond was found, laying on the ground with multiple gunshot wounds.  Medics did not detect a carotid pulse.  (Brose Decl.) Desmond was then quickly placed onto

a gurney and into the ambulance for further evaluation and treatment. In route to the hospital, E2 firefighters assisted medics with compressions and respirations. (Brose Decl.). The ambulance arrived at Enloe Hospital in Chico where Desmond was pronounced dead. (Brose Decl.).

The uncontroverted facts established that after the shooting ceased, the already on-site Fire Department and EMT personnel rendered immediate medical aid at the scene. Additionally, Desmond was transported from the apartment to Enloe Hospital. (Brose Decl.). The conduct of Defendants in seeking post shooting medical aid and assistance was reasonable under the Fourth Amendment and Plaintiffs' failure to render medical assistance claim should be dismissed as a matter of law. Additionally, the individual officers are entitled to qualified immunity because an officer confronted with this situation would have reasonably believed that his conduct did not violate Desmond Phillips' Fourth Amendment rights.

G.    **BECAUSE PLAINTIFFS' CONSTITUTIONAL RIGHTS WERE NOT VIOLATED, THERE IS NO *MONELL* LIABILITY ON THE PART OF THE CITY**

Plaintiffs' Fourth Claim for Relief (failure to train and unconstitutional custom, practice, or policy) are all brought against the City on theories of municipal liability pursuant to § 1983. As set forth above, each of the Plaintiffs' constitutional claims against the officers fail as a matter of law either because no constitutional violation took place in the first instance or because the officers are entitled to qualified immunity. The City is, therefore, entitled to adjudication in its favor on all three claims alleged against it as a matter of law because a municipality cannot be held liable under § 1983 absent an underlying constitutional violation by one or more of its officers. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

In the event the Court denies summary judgment on any of Plaintiffs' constitutional claims against the officers, Plaintiffs still cannot establish municipal liability on the part of the City under *Monell v. Department of Social Services of*

ALVAREZ-GLASMAN & COLVIN
ATTORNEYS AT LAW

*City of New York*, 436 U.S. 658 (1978) or *City of Canton, Ohio v. Harris,* 489 U.S. 378 (1989).

The Fourth claim for relief constitutes a claim under *Monell*, which holds that a public entity can be sued under 42 U.S.C. § 1983 if its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" causes a constitutional violation." *Monell* at 693.  For a municipality to be held liable on a *Monell* claim, a plaintiff must prove that the action – pursuant to official municipal policy – caused a constitutional tort.  Put another way, the deliberate conduct of the municipality must be the "moving force" behind the injury alleged.  *Id.* at 694.  The Fourth Claim also for relief is based on the alleged inadequate training of the Officers.  In *City of Canton*, the Supreme Court held that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train in a relevant respect amounts to deliberate indifference to the constitutional rights of persons with whom the police came into contact.  Only where a failure to train reflects a "deliberate" or "conscious" choice by the municipality can the failure be properly thought of as an actionable city "policy."  The plaintiff must prove that the deficiency in training actually caused the officer's indifference to the plaintiff's constitutional rights.  As such, the undisputed material facts establish that Plaintiffs have no evidence to support the *Monell* claims. Even so, all the individually named Defendants and the City's supervisorial officers are entitled to dismissal based on the Doctrine of Qualified Immunity.  Thus, summary adjudication of the claims for inadequate training and unconstitutional custom, policy, or practice is proper.  *Celotex Corp.*, 477 U.S. at 322-323 (1986).

///

///

///

///

35

1

**V.      CONCLUSION:**

2       For the foregoing reasons, Defendants request that the Court grant their

3   Motion for Summary Judgment, or in the alternative, grant partial summary

4   Judgment as the Court deems appropriate.

5

6   Dated:  June 20, 2019               ALVAREZ-GLASMAN & COLVIN
                                        ARNOLD M. ALVAREZ-GLASMAN
7                                       CITY ATTORNEY

8

9                                       /s/ Roger A. Colvin, Esquire
                                        Roger A. Colvin
10                                      Attorneys for Defendants
                                        City of Chico, Jeremy Gagnebin, Alex
11                                      Fliehr, and Jared Cumber

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2019, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court Eastern District of California by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/Maria Luisa Espinosa
Maria Luisa Espinosa



ALVAREZ-GLASMAN & COLVIN
ATTORNEYS AT LAW