JOHN L. BURRIS, Esq., SBN 69888
BENJAMIN NISENBAUM, Esq., SBN 222173
LATEEF H. GRAY, Esq., SBN 250055
**LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882
john.burris@johnburrislaw.com
bnisenbaum@hotmail.com
lateef.gray@johnburrislaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

DAVID PHILLIPS, individually and as a co-successor-in-interest to Decedent DESMOND PHILLIPS; DELPHINE NORMAN, individually and as a co-successor-in-interest to Decedent DESMOND PHILLIPS; CHADRICK INGRAM, individually; K.T. by and through his Guardian Ad Litem LATISHA WILLIAMS,

                        Plaintiffs,

    vs.

CITY OF CHICO, a municipal corporation; JEREMY GAGNEBIN, individually and in his capacity as an officer for the Chico Police Department; ALEX FLIEHR, individually and in his capacity as an officer for the Chico Police Department; JARED CUMBER, individually and in his capacity as an officer for the Chico Police Department; and DOES 1-50, inclusive, individually and in their official capacities as police officers for the CITY OF CHICO Police Department,

                        Defendants.

CASE NO.: 2:18-cv-00153-JAM-DMC

**PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Date: July 30, 2019
Time: 1:30 p.m.
Ctrm: 6

Honorable John A. Mendez

# **TABLE OF CONTENTS**

Introduction ..................................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 2

A. The Subject Incident ................................................................................................... 2

1. The Defendant Officers Respond to Paramedics call for Assistance with a
Mental Health Issue ........................................................................................................ 2

2. The Defendant Officers Contact Desmond Phillips .................................................... 2

3. The Defendant Officers Create a Tactical Plan and Other Officers Respond .............. 3

4. The Defendant Officers Force Entry into the Phillips Home ...................................... 4

5. The Defendant Officers Provide Conflicting Stories of What Led to the Use of Deadly Force .. 4

        Defendant Fliehr's Account ................................................................................... 4

        Defendant Gagnebin's Account ............................................................................. 5

        Defendant Cumber's Account ............................................................................... 6

B. The Defendant Officers Failed to Appropriate Handle Desmond's Mental Illness .................... 8

1. The Defendant Officers did not Consider Desmond's Mental Illness in their Use of Force or
Approach to Desmond ..................................................................................................... 8

2. The Defendant Officers Failed to Share Information of Desmond's Mental Illness with One
Another ............................................................................................................................ 8

3. Plaintiffs' Police Practice Expert Opines that the Defendant Officers Failed Individually and Their
Actions Reveal a Failure on the Part of Defendant City .................................................. 9

ARGUMENT .................................................................................................................. 10

A. Legal Standard on Summary Judgment ..................................................................... 10

B. Under Each Defendants' Version of the Subject Incident the Use of Deadly Force on Desmond
was Unreasonable ........................................................................................................... 11

1. Objective Reasonableness and Qualified Immunity Legal Standards ........................ 11

2. Objective Reasonableness Analysis ......................................................................... 12

3. Qualified Immunity Analysis ................................................................................... 15

C. Material Fact Questions Concerning Whether the Defendant Officers Accommodated Desmond's Mental Illness Preclude Summary Judgment on Plaintiffs' ADA Claim ........................................ 17

D. The Defendant Officers' Conduct Shocks the Conscience in Violation of the Fourteenth Amendment .......................................................................................................................... 19

E. Material Fact Questions Preclude Summary Judgment on Plaintiff's *Monell* Claims ............... 19

F. Material Fact Questions Preclude Summary Judgment of Plaintiff's State Law Claims ........... 20

1. Battery .......................................................................................................................... 20

2. Negligence and NIED .................................................................................................... 21

3. Bane Act ........................................................................................................................ 22

CONCLUSION ..................................................................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016).....................................13

*Anderson v. Creighton*, 483 U.S. 635 (1987)...................................................................................12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................................10

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) .......................................................................................12

*Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002).........................................................................22

*Boyd v. Benton Cty.*, 374 F.3d 773 (9th Cir. 2004)..........................................................................19

*Brown v. Ransweiler*, 171 Cal.App.4th 516 (2009).........................................................................21

*Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010)................................................................12, 13

*Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014) ...................................................22

*City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015).......................................17

*City of Canton*, 489 U.S. 378 (1989) ...............................................................................................20

*Cornell v. City and Cty. of San Francisco*, 17 Cal.App.5th 766 (2017)..........................................22

*Curnow By and Through Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991)...................15

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir 2001)........................................................................13

*Edson v City of Anaheim*, 63 Cal,App.4th 1269 (1998)...................................................................20

*Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017)...................................12, 15

*Franklin v. Foxworth*, 31 F.3d 873 (9th Cir. 1994)..........................................................................12

*Freeman v. Arpaio*, 125 F.3d 723 (9th Cir. 1997)............................................................................10

*George v. Morris*, 736 F.3d 829 (9th Cir. 2013).........................................................................15, 16

*Gilmore v. Superior Court*, 230 Cal.App.3d 416 (1991)..................................................................21

*Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011)......................................................12, 13

*Graham v. Connor*, 490 U.S. 386 (1989).....................................................................................11, 12

*Gregory v. County of Maui*, 523 F.3d 1103 (9th Cir. 2008).............................................................11

*Grudt v. City of Los Angeles*, 2 Cal.3d 575 (1970)..........................................................................21

*Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997)..........................................................................16

*Hayes v. Cnty of San Diego* (*Hayes*), 57 Cal.4th 622, 632 (2013).................................................21

1   *Hope v. Pelzer*, 536 U.S. 730 (2002) ...........................................................................12

2   *Hughes v. Kisela*, 862 F.3d 775 (9th Cir. 2016)...........................................................15

3   *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) ......................................10

4   *Keenan v. Allan*, 91 F.3d 1275 (9th Cir. 1996) ............................................................10

5   *Lal v. California*, 746 F.3d 1112 (9th Cir. 2014) ........................................................16

6   *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ...........................................20

7   *Long v. Cnty of Los Angeles*, 442 F.3d 1178 (9th Cir. 2006) ......................................20

8   *Mackinney v. Nielsen*, 69 F.3d 1002 (9th Cir. 1995).....................................................19

9   *Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...........10

10   *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) ......................................................14

11   *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ...........................................17, 19

12   *Munoz v. Olin*, 24 Cal.3d 629 (1979)..........................................................................21

13   *Nelson v. City of Davis*, 709 F.Supp.2d 978 (2010) ...................................................20

14   *Newmaker v. City of Fortuna*, 842 F.3d 1108 (9th Cir. 2016) ....................................11

15   *Pearson v. Callahan*, 555 U.S. 223 (2009) ................................................................12

16   *Plumhoff v. Rickard*, 134 S.Ct 2012 (2014) ...............................................................12

17   *Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008)........................................................19

18   *Quiroz v. Seventh Ave. Center*, 140 Cal.App.4th 1256 (2006) ....................................21

19   *Reese v. Cnty. of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) ...................................22

20   *Sheehan v. City & County of SF.*, 743 F.3d 1211 (9th Cir. 2014).........................17, 18

21   *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005)..................................................13

22   *Thing v. La Chusa*, 48 Cal.3d 644 (1989) ..................................................................22

23   *United States v. Reese*, 2 F.3d 870 (9th Cir. 1993) .....................................................23

24   *Venegas v. Cnty of Los Angeles*, 153 Cal. App. 4th 1230 (2007)................................22

25   *Vinson v. Thomas*, 288 F.3d 1145 (9th Cir. 2002) ......................................................17

26   *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018).................................17, 18

27   *Wood v. Moss*, 134 S.Ct. 2056 (2014)........................................................................17

28   *Woodward v. City of Tucson*, 870 F.3d 1154 (9th Cir. 2017) ......................................16

## Statutes

42 U.S.C. § 12132 ................................................................................................................ 17

42 U.S.C. § 1983 ........................................................................................................... 12, 17

Fed.R.Civ.P. 56(a) ............................................................................................................. 10

Fed.R.Civ.P. 56(e) ............................................................................................................. 10

Federal Rule of Civil Procedure 56(a) .............................................................................. 10

Federal Rule of Civil Procedure, Rule 56(a) ..................................................................... 10

## 8

Cal. Code Civil Procedure § 377.60 ................................................................................. 21

Civil Code § 52.1 ............................................................................................................... 22

**INTRODUCTION**

Plaintiffs David Phillips et al. brought this action arising from the unlawful shooting death of, Desmond Phillips, by Defendant City of Chico police officers Jared Cumber, Alex Fliehr and Jeremy Gagnebin. Desmond was in the midst of mental health emergency and was being tended to by City of Chico Fire and Paramedic personnel, when he became resistive with them and they called for police assistance. The Defendant Officers looked into the open front door to the Phillips ground floor apartment to see Desmond, wearing earbuds, blankly staring, and holding a knife in each hand. Desmond then closed the front door. Dispatch informed that Desmond was kicking in David Phillips' bedroom door in an attempt to attack him. So, the Defendant Officers forced entry into the Phillips home. Upon their breach, they found Desmond, at the front door—not kicking in a bedroom door. Officer Cumber effectively tased Desmond causing him to the fall to the ground. Instead of immediately checking Desmond for weapons and handcuffing him, the Defendant Officers allowed Desmond to stand to his feet. From there, the Defendant Officers' testimony regarding what happened next is wildly divergent from each other's account and in some instances internally inconsistent with their Officer Involved Shooting ("OIS") statements that they provided. Defendant Fliehr testified that Desmond still had a knife in each hand, moved his arms in a swimming motion as he fast approached him and Officer Gagnebin. Officer Gagnebin testified that Desmond stood to his feet, bent down and picked up a single object, lifted his arm above his head and repeatedly slashed down with the object (as though in "Psycho style") as he fast approached him and Officer Fliehr. Whereas, Defendant Cumber testified that he observed Desmond from behind and saw Desmond swing his arms and shoulders horizontally from left to right, he never exposed his hands for Cumber to know whether he was grasping knives, and that Desmond neither moved his arms in a swimming motion nor raised either hand above his head. Based on their respective observations, Defendant Fliehr and Gagnebin shot Desmond 11 times. Meanwhile, Defendant Cumber endeavored to change his Taser cartridge. Importantly, both knives were located just near the front door—not deeper into the apartment—and "the object" was a broken piece of door jamb with a metal strike plate on it.

Plaintiffs maintain that the Defendant Officers unreasonably used deadly force on Desmond Phillips. First of all, summary judgment is precluded based on the Defendant Officers' wildly

divergent stories. Second, the Defendant Officers' stories are not credible and even if they were none of the stories warrant the use of deadly force. Plaintiffs' Opposition to Defendants' Motion for Summary Judgment is based on the arguments made below, on the Declaration of Benjamin Nisenbaum (hereinafter Nisenbaum Declaration), filed herewith and all exhibits attached thereto, on the court's file in this matter and on any such oral and/or documentary evidence presented at the hearing on this motion.

## STATEMENT OF FACTS

**A. The Subject Incident**

**1. The Defendant Officers Respond to Paramedics call for Assistance with a Mental Health Issue**

On March 17, 2017 at approximately 7:00 p.m., Defendant Officers Cumber and Gagnebin responded to a call from Defendant City fire department personnel for assistance with a subject that became hostile with them. (See Gagnebin Deposition Transcript at 15:17-19, 25:25-26:3, 39:10-25, 41:16-25, attached to the Nisenbaum Declaration as Exhibit A; Cumber Deposition Transcript at 20:2-9, 21:2-5, 39:13-23, 41:3-8, 43:13-21, attached to the Nisenbaum Declaration as Exhibit B.) Dispatch indicated that the call concerned a mentally ill person, not a crime bring committed. (Gagnebin Depo 19:9-22; Cumber Depo 25:6-14.) Upon their arrival, the paramedic personnel informed that the subject suffered from a seizure disorder and had a history of mental illness, that he became combative when they provided assistance and that it was probably a mental health issue. (Cumber Depo 41:13-42:8.)

**2. The Defendant Officers Contact Desmond Phillips**

The Defendant Officers approached the front door of the Phillips' ground floor apartment and observed Desmond, through the open front doors, standing in the living room wearing earbuds. (Gagnebin Depo 59:16-13, Cumber Depo 48:3-50:3.) As the Officers approached the door, Desmond started pacing back and forth and threw an object he was holding at the door. (Cumber Depo 50:7-51:10; Gagnebin Depo 72:13-73:7.) The Defendant Officers closed the security door and Officers Gagnebin and Fliehr attempted to speak with Desmond, but Desmond kept pacing and never removed his earbuds and did not acknowledge the officers. (Gagnebin Depo 74:14-24, 75:5-14; Cumber Depo

53:7-17, 55:4-13, 56:1-2, 74:18-75:6.) The officers next observed Desmond pacing the hallway in front of the kitchen with one average sized kitchen knife in each of his hands pointed down by his sides. (Cumber Depo 71:23-74:4; Gagnebin Depo 72:4-12, 73:8-25, 89:4-90:22; (See Fliehr Deposition Transcript at 52:8-19, 87:5-22 attached to the Nisenbaum Declaration as Exhibit C.) The Officers stepped back from the door, and Desmond then closed the front door. (Cumber Depo 74:11-17; Gagnebin Depo 75:15-76:3; Fliehr Depo 64:3-11.)

**3. The Defendant Officers Create a Tactical Plan and Other Officers Respond**

With the front door closed, the Defendant Officers developed a tactical plan that if Desmond presented himself and was armed, Defendant Cumber would deploy his Taser first and Defendants Gagnebin and Fliehr would disarm Desmond and provide lethal cover if needed. (Gagnebin Depo 34:4-15, 84:14-18, 86:10-17; Cumber Depo 79:19-80:3; Fliehr Depo 75:4-16.) The Defendant Officers did not get input on their plan from the Sergeants that responded to the scene. (Cumber Depo 80:4-81:25.) Sergeant Michael Williams responded to the scene and brought a ballistic shield for the officers' protection and offered to retrieve his less lethal shotgun. (Fliehr Depo 73:15-74:24; see Deposition Transcript of Michael Williams at 48:6-50:2, 51:2-17, attached to the Nisenbaum Declaration as Exhibit D.) Meanwhile other Defendant City police officers attempted to gain access into the apartment via the rear. (Fliehr Depo 69:19-25, 70:17-24; Gagnebin Depo 50:4-20, 69:25-71:15.)

Dispatch informed the Defendant Officers that the subject's father and two children were in a bedroom in the home. (Fliehr Depo 54:11-15, Gagnebin Depo 59:16-60:13.) The Defendant Officers did not make efforts to ascertain which room the father was located. (Fliehr Depo 54:19-55:5, 63:1-20; Cumber Depo 76:2-18, 77:3-78:15.) Dispatch then informed that Desmond was trying to kick in the bedroom door and stab his father. (Fliehr Depo 49:25-50:25; Cumber Depo 70:20-71:9.) At this time, the Defendant Officers could hear arguing, and pounding from inside the apartment and observed the apartment windows shudder from the pounding. (Fliehr Depo 51:12-52:1; Gagnebin Depo 44:1-3, 90:3-91:7.) Sergeant Williams, who was approaching with his less lethal shotgun, immediately instructed the Defendant Officers to "go, go, go," meaning make entry. (Cumber Depo 89:18-19, 91:10-22; Williams Depo 54:7-55: 12; Fliehr Depo 73:15-74:24.)

**4. The Defendant Officers Force Entry into the Phillips Home**

After two attempts at forcing the door open, Defendant Fliehr, with his firearm in hand, opened the security door, which was apparently unlocked, using the doorknob. (Fliehr Depo 76:3-77:17; Gagnebin Depo 77:5-18; Cumber Depo 92:1-93:14.) Defendant Fliehr then kicked the front door open. (Fliehr Depo 78:1-21; Gagnebin Depo 83:23-84:5; Cumber Depo 95:6-96:8.) Surprisingly, Desmond was not deep in the apartment kicking in a bedroom door but was standing right at the front door. (Fliehr Depo 78:22-79:7; Gagnebin Depo 87:3-15; Cumber Depo 96:9-17.)

Without warning Desmond that he would be tased, Defendant Cumber deployed his Taser which made contact with Desmond and caused him to fall facedown to the ground. (Cumber Depo 35:21-36:1, 97:11-23, 98:2-13, Gagnebin Depo 90:23-91:22; Fliehr Depo 88:13-89:23.) Defendants Fliehr and Gagnebin entered the apartment intending to handcuff Desmond while he was under the power of the Taser but did not immediately go hands on. (Fliehr Depo 80:21-24, Gagnebin Depo 94:1-17, 95:18-96:14.) Fliehr was in the process of securing a knife that was on the floor on Desmond's left side, when he realized the Taser was no longer effective and Desmond began to stand. (Fliehr Depo 90:7-92:2; Gagnebin Depo 108:10-12, Cumber Depo 98:23-99:7.) The Defendant Officers could not see Desmond's right hand under his body and assumed he still held a knife with that hand. (Fliehr Depo 92:18-25; Gagnebin Depo 101:21-102:20.) Defendant Fliehr and Gagnebin retreated into the apartment and Cumber remained at the front door when Desmond stood. (Fliehr Depo 93:14-21, 94:25-95:8.)

**5. The Defendant Officers Provide Conflicting Stories of What Led to the Use of Deadly Force**

The Defendant Officers each provide conflicting accounts of what occurred at this point, and none of their stories are corroborated by other officers that witnessed the event, as follows:

***Defendant Fliehr's Account***

According to Defendant Fliehr, once Desmond stood up, when the Taser was no longer effective, he had a knife in each hand, and he started running at Fliehr and Gagnebin making a slashing motion. (Fliehr Depo 93:1-3, 94:25-95:8.) Desmond's head was down, and he ran in a bull rush motion, and his arms were moving in a short-armed freestyle swimming motion. (Fliehr Depo 95:9-96:15.) This caused Defendant Fliehr to fear for his life and that of Defendant Gagnebin, so he

began shooting when Desmond was 2 to 8 feet away from him. (Fliehr Depo 103:18-20, 104:8-25.) Fliehr fired nine shots at Desmond. (Fliehr Depo 106:17-107:15.)

In fact, Desmond did not have any knife in his hands at the time of the shooting. Sergeant Lefkowitz testified that Desmond stood up while the taser was still cycling and he was moving in a wild, jerky chicken-dance type manner (as if the Taser was still active on him), and at this time, he had a single elongated object with a metal reflective piece on it in his hand. (See Deposition Testimony of Todd Lefkowitz at 21:12-22:23, 31:14-22, attached to the Nisenbaum Declaration as Exhibit E.) Lefkowitz was the fifth officer in "the stack" that approached the Phillips' front door, and from the back of the stack he could see both of Desmond's hands and he had only one object in one hand and no other object in his other hand. (Lefkowitz Depo 19:10-20:3, 22:1-17.) Moreover, after the shooting Lefkowitz observed that Desmond still had the one object in one of his hands and it was not a knife. (Lefkowitz Depo 23:19-24:4, 24:18-25:25.) Lefkowitz also observed two knives directly at the threshold of the front door several feet away from Desmond's hands. Only the object (a piece of wood-shatter from the broken-open door jamb with the metal strike plate and nail in it) was in his hand. (Lefkowitz Depo 27:3-31:6.) Defendants Cumber and Gagnebin testified that Desmond did not make a swimming motion. (Cumber Depo 116:5-10; Gagnebin Depo 113:15-25.)

***Defendant Gagnebin's Account***

Defendant Gagnebin was 1 to 10 feet away from Desmond when he stood up and does not recall seeing anything in either of Desmond's hands when he initially stood up. (Gagnebin Depo 108:13-15, 112:13-24.) Defendant observed Desmond stand all the way up, then he bent down and grabbed an item off the floor—in two distinct motions. (Gagnebin Depo 108:25-109:11, 150:13-22.) Once Desmond stood again, he started advancing on Gagnebin, swinging his arms over his head in a downward slashing motion, repeatedly raising the object above his head and slashing it downward in a stabbing motion ("Psycho-esque"). (Gagnebin Depo 113:15-114:9, 115:11-116:13.) The object was something that came to a point with a metallic piece on it. (Gagnebin Depo 114:10-12.) Gagnebin was moving backwards, no one said anything, Fliehr fired his gun, and then Gagnebin fired his gun 7 times. (Gagnebin Depo 116:17-117:2, 118:16-21, 119:7-11, 120:7-8, 122:18-123:7.) Gagnebin

testified that he shot because he feared for his life because Desmond was making stabbing motions and moving quickly toward him. (Gagnebin Depo 122:18-123:7.)

In fact, the object turned out to be an 8.25-inch long piece of broken door jamb with a strike plate partially attached to it and a nail sticking out of it. (Lefkowitz Depo 24:18-25:3, 26:6-21; see DOJ 22-description and photos of "the object," attached to the Nisenbaum Declaration as Exhibit F.) And Gagnebin's account is not supported by the other officers:

- Defendants Cumber and Fliehr did not see Desmond stand up and then bend down and pick up an object. (Cumber Depo 106:12-107:1; Fliehr Depo 97:14-18.) Neither did Sergeants Williams or Lefkowitz. (Williams Depo 81:3-10; see Deposition Testimony of Todd Lefkowitz at 34:4-23.)

- Defendant Cumber did not see Desmond raise his arms above his head after he stood up. (Cumber Depo 114:19-23, 118:2-119:1.) Neither did Sergeant Williams. (Williams Depo 95:22-96:23.)

- Defendant Fliehr testified that Desmond incidentally raised his arms while making the swimming slashing motion, but that he did not raise the knives over his head and stab down in Psycho-esque motion. (Fliehr Depo 96:18-97:4.)

- Defendant Fliehr observed Desmond with two large steak knives with silver blades, one in each hand—not a wooden object with a metallic piece. (Fliehr Depo 87:5-22, 93:1-3.)

- Just after the shots were fired, Sergeant Lefkowitz observed that one of the shooting officers had a shield in his left hand and a firearm in his right hand, likely Gagnebin. (Lefkowitz Depo 39:2-12; Gagnebin Depo 79:23-82:2.)

***Defendant Cumber's Account***

Once Desmond started to stand, Defendant Cumber tried to reactivate the Taser to no avail. (Cumber Depo 103:16-25.) Desmond stood up facing into the apartment, such that his back was turned to Defendant Cumber. (Cumber Depo 106:12-17, 107:5-20.) Defendant Cumber could only see Desmond's back and arms. (*Id.*)

Desmond was swinging and slashing his arms from side to side. (*Id.*) Defendant Cumber was reloading the Taser as Desmond made the slashing motions. (Cumber Depo 107:16-22.) Cumber did

not announce to his fellow officers that he was reloading the Taser, and Defendant Officers Fliehr and Gagnebin did not know he was reloading the Taser, as the officers were not communicating at this point. (Cumber Depo 32:17-25; Gagnebin Depo 97:22-25; Fliehr Depo 92:3-10, 118:5-20.) As he was reloading the Taser, he heard approximately ten overlapping gunshots. (Cumber Depo 107:23-25, 109:13-22.) Upon hearing the gunshots, Cumber transitioned to his firearm. (Cumber Depo 104:24-105:5.)

Defendant Cumber testified that he could not see Desmond's hands and thus did not know whether he had knives or any object in his hands once he regained his feet. (Cumber Depo 114:14-18.) Defendant Cumber testified in his deposition that Desmond rushed Defendants Fliehr and Gagnebin as he was making the slashing motions, but he did not mention that Desmond moved rapidly or rushed towards the other officers during his OIS interview. (Cumber Depo 112:25-114:13, 115:2-4; (See Cumber OIS video interview at 29:06-30:22, 51:30-52:06, 55:10-45 attached to the Nisenbaum Declaration as Exhibit G) (all references to the OIS video are by minutes: seconds): Desmond was "crouched", swinging his right arm back and forth while his left arm was tucked into his body, and "focused on" Defendants Fliehr and Gagnebin and was blocking their exit from the house; and was "moving that way" toward Defendants Fliehr and Gagnebin. Cumber told investigators that he ducked out of the doorway of the house when shots were being fired, and then went back into the house after the shots ended, where he observed that Desmond was on the ground after being shot, in the same location by the kitchen counter where they saw him pacing when they first arrived. (Cumber OIS video interview, 30:15-44).

Furthermore, Defendant Cumber told investigators he couldn't see the actual shooting partly because Desmond was in between himself and the other officers, though he could see the flashes from the gunshots and could feel the debris caused by the shooting. (Cumber OIS video interview 54:17-55:10). Defendant Cumber told investigators that he didn't know how close Desmond was to Defendants Fliehr and Gagnebin at the time of the shooting, in part because he didn't know if those defendants knew they could, or if they had actually, retreated down a hallway plainly available to them. Defendant Cumber again told investigators only that Desmond moved in their direction, as opposed to rushing or moving rapidly (Cumber OIS video interview 55:10-56:00). In extending

questioning about this part of the event, Defendant Cumber never said Desmond moved fast or rushed toward Defendants Fliehr and Gagnebin. Instead, he clarified that his attention was diverted from Desmond as he stepped out of the doorway (out of the house), was attempting to change the cartridge on his taser, and once he "got the cartridge in the shots were going off." (Cumber OIS video 56:40-58:30). Defendant Cumber told investigators his vision was in fact diverted from Desmond and the scene in order to reload the taser cartridge (Cumber OIS video 58:34-59:16, even demonstrating how he reloaded the taser having to look down, away from the scene, and by the time he finished reloading and looked up, shots were going off.). Cumber plainly did not see Desmond rushing Fliehr and Gagnebin, or even see where Desmond was in relation to the them, when they shot him.

**B. The Defendant Officers Failed to Appropriate Handle Desmond's Mental Illness**

**1. The Defendant Officers did not Consider Desmond's Mental Illness in their Use of Force or Approach to Desmond**

All of the Defendant Officers testified that Desmond had a flat and vacuous type stare and was non-responsive. (Cumber Depo 56:11-57:6; Gagnebin Depo 63:20-64:6; Cumber Depo 57:7-22.) The Defendant Officers also knew that the CAD indicated the call concerned a mentally ill person, not necessarily a crime being committed. (Gagnebin Depo 19:9-22.) Indeed, the paramedics informed the Defendants that Desmond was suffering from a seizure disorder and was possibly mentally impaired. (Gagnebin Depo 68:3-11.)

It was clear to Defendant Fliehr that Desmond was mentally impaired. (Fliehr Depo 85:24-86:12.) However, despite all of the information from the paramedics and provided by dispatch and his own observations of Desmond, Defendants Gagnebin and Cumber did not consider Desmond's mental health because they could not speak to him themselves. (Gagnebin Depo 66:9-20; Cumber Depo 58:1-59:3.)

**2. The Defendant Officers Failed to Share Information of Desmond's Mental Illness with One Another**

Three months prior to the subject-incident, both Defendants Fliehr and Gagnebin responded to the Phillips home where they and other officers had to go hands on with Desmond in order to handcuff him. (Gagnebin Depo 141:8-142:9, Fliehr Depo 23:1-31:3.) Ultimately, Desmond was

placed in a full body restraint and 5150'd. (Fliehr Depo 20:20-21:15, 66:7-11.) Incredibly, Gagnebin could only remember that Desmond had struck his father in the face during that incident. Defendant Cumber testified that Gagnebin informed him that he had responded to the Phillips home before but did not describe the nature of the call or in any way inform that mental illness was involved. (Cumber Depo 42:9-22, 61:16-25.) Defendant Cumber even testified the fact that Gagnebin had previously responded to that location for a 5150 was not relevant to the subject incident. (*Id.*) Upon his arrival on the scene, Defendant Fliehr confirmed that he and Gagnebin had previously responded to the Phillips home but he did not engage in any discussion about Desmond's mental illness. (Fliehr Depo 43:19-44:6.) The Sergeants similarly were not aware that Defendants Fliehr and Gagnebin had previously responded to the Phillips' home where Desmond was 5150'd. (Lefkowitz Depo 18:7-23; Williams Depo 84:25-85:11.)

**3. Plaintiffs' Police Practice Expert Opines that the Defendant Officers Failed Individually and Their Actions Reveal a Failure on the Part of Defendant City**

Plaintiff's Police Practices Expert, Roger Clark, opined that the Defendant Officers failed to properly develop a tactical plan and failed to not include Sergeant Williams, the scene commander, in their planning discussions. (See Clark's Rule 26 Rebuttal Report at p. 7, attached to the Nisenbaum Declaration as Exhibit H.) Clark explains that the failure in planning includes the fact that the Defendant failed to communicate that they had previously placed Desmond on a 5150 hold and did not collectively ascertain that Desmond was, indeed, mentally impaired. (Id.) As a result, the Defendant Officers did not develop a plan that took Desmond's obvious mental impairment into consideration. (Id.) Clark also opined that the Defendants utterly failed to immediately go hands on, even though their plan was to do just that if the Taser was successful, which it was. (Clark Report pp. 7-8.) Clark also opined that the Defendants did not identify the location of the other people in the Phillips home and to factor Desmond wearing earbuds into their analysis of his non-responsiveness. (Clark Report p. 7.) Clark also opines that, the Defendants' varying accounts of the moments leading to the shooting notwithstanding, the Defendant had ample less-intrusive alternatives to lethal force which should have been utilized. (Clark Report p. 8.) And he opines that Defendants Fliehr and

Gagnebin fired their guns excessively which prevented appropriate redeployment of the Taser and that gunfire was unreasonable. (Clark Report pp. 8-9.)

## ARGUMENT

### A. Legal Standard on Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought." It further provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Material facts are those that may affect the outcome of the case. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*. Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id*. (citing Fed.R.Civ.P., Rule 56(e)). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

In resolving a motion for summary judgment, the evidence of the opposing party is to be believed. See *Anderson*, 477 U.S. at 255. Moreover, all reasonable inferences that may be drawn from the facts placed before the court must be viewed in a light most favorable to the opposing party. See *Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the nonmoving party." *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

Here, the Defendant Officers provide three distinct, incompatible versions of the subject incident that are largely contradicted and not supported by other percipient witnesses. Defendants

1   move for summary judgment by asking this Court to make a factual determination on the varying

2   versions of the facts, make witness credibility determinations, and otherwise decide material fact

3   disputes on the central issues of this litigation. As such, their motion for summary judgment must be

4   denied.

5   **B. Under Each Defendants' Version of the Subject Incident the Use of Deadly Force on**

6   **Desmond was Unreasonable**

7       Defendants contend that the Defendant Officers' use of deadly force was objectively

8   reasonable, and argue that they are entitled to qualified immunity. Plaintiffs maintains that material

9   fact questions preclude summary judgment on whether the officers' actions were objectively

10  reasonable and viewing the facts in the light most favorable to Plaintiffs, it has been clearly

11  established that their uses of force amounted to constitutional violations.

12  *1. Objective Reasonableness and Qualified Immunity Legal Standards*

13      In evaluating a Fourth Amendment claim of excessive force, courts ask "whether the officers'

14  actions are 'objectively reasonable' in light of the facts and circumstances confronting them" which

15  "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth

16  Amendment interests' against the countervailing governmental interests at stake." *Graham v.*

17  *Connor*, 490 U.S. 386, 396-97 (1989). This analysis involves three steps: 1) assess the severity of the

18  intrusion by evaluating the type and amount of force inflicted; 2) evaluate the government's interest

19  in the use of force, and 3) balance the gravity of the intrusion on the individual against the

20  government's need for that intrusion. *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir.

21  2016). However, "[c]ases in which the victim of alleged excessive force has died 'pose a particularly

22  difficult problem' in assessing whether the police acted reasonably, because 'the witness most likely

23  to contradict [the officers'] story…is unable to testify.'" *Gregory v. County of Maui*, 523 F.3d 1103,

24  1107 (9th Cir. 2008) (citation omitted). Thus, the court must assess the evidence to determine the

25  credibility of the officers' account of the events. *Id.*

26      The strength of the government's interest in the force used is evaluated by examining three

27  primary factors: (1) whether the suspect poses an immediate threat to the safety of the officers or

28  others, (2) the severity of the crime at issue, and (3) whether he is actively resisting arrest or

attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. These factors, however, are not exclusive. This Court directs trial courts to "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d at 826 (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to the officer that the person was emotionally disturbed. See, e.g., *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011).

However, public officials are immune from suit under 42 U.S.C. § 1983 unless they have "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S.Ct 2012, 2023 (2014). To determine whether a government official is entitled to qualified immunity, this Court must determine whether: (1) the facts that a plaintiff has alleged or proved show a violation of a constitutional right, and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct. See *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

An officer's actions violate a clearly established right when, at the time of the challenged actions, "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1017 (9th Cir. 2017) (alterations omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). This requirement does not mean that there must be a prior case with identical facts. An officer can still be on notice that his conduct "violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). But, "in the light of pre-existing law [,] the unlawfulness [of the officer's conduct] must be apparent." *Id*. at 739 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### 2. Objective Reasonableness Analysis

*Nature of the Intrusion*: Desmond Phillip's shooting death resulted from the Defendant Officers' uses of deadly force. Clearly, the severity of this intrusion on his Fourth Amendment

interests was "extreme" and "unmatched." *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016).

*Governmental Interests*: Here, Defendants were not responding to a reported crime. Desmond was in medical distress and needed medical assistance. See *Glenn v. Washington County*, 673 F.3d 864, 874 (9th Cir. 2011) (identifying that the "character of the offense" is "an important consideration" especially when no crime has been identified). Chico fire and paramedics were on scene because Desmond was suffering from seizures, however, his potential 5150 status was preventing him from getting the medical care he needed. Of course, as Desmond refused medical care and closed the front door on the Defendant Officers, there was no chance of him fleeing; indeed, it appears that he was determined to stay in his home. *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010).

Whether the Defendant Officers considered Desmond's mental illness into their approach to him presents a material fact question. The Defendant Officers initially tried to speak with Desmond; however, when he was non-responsive to them, they did not attempt de-escalation any further. The Defendant Officers did not even communicate with each other that they had encountered Desmond before when he was 5150'd. *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir 2001) (opining law enforcement must take care in their tactics when dealing with a mentally ill individual, as increasing the use of force may exacerbate the situation).

The Defendant Officers squandered several opportunities to take Desmond into custody by less intrusive means. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) ("the availability of alternative methods of capturing or subduing a suspect may be a factor to consider,"). Defendants informed police investigators they did not know why they did not immediately secure Desmond when he was on the ground immediately following the effective Taser deployment. Defendants did not consult with Sergeant Williams to include the use of the less lethal shotgun into the tactical plan. And finally, the shooting officers began shooting, vitiating Defendant Cumber's ability to redeploy the Taser which was clearly effective.

The most important factor "whether the suspect poses an immediate threat to the safety of the officer or others" is the central factor at issue here. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir.

2011) (en banc). It is undisputed that upon their forced entry into the Phillips home, any threat to the occupants of the home had abated because: 1) the occupants were locked in bedrooms, and 2) Desmond was at the front door—not attempting to kick in a bedroom door. Material fact questions preclude determination of whether Desmond posed an immediate threat to the Defendant Officers, under any of their versions of the incident:

According to Defendant Fliehr, Desmond stood up armed with a knife in each hand and ran at Fliehr and Gagnebin with his head down and moving his arms in a swimming motion. This account is belied by the fact that Desmond was not armed with knives; indeed, the knives were at the threshold of the front door at the time of the shooting. None of the other officers saw Desmond moving his arms in a swimming motion. Importantly, Sergeant Lefkowitz testified that when he regained his feet Desmond was still under the influence of the Taser and his movements were a jerky high-stepping chicken dance; whereas, Sergeant Williams saw Desmond make the same jerky movements and then pop up. The Sergeants' observations belies all of the Defendant Officers' testimony that Desmond was directly charging and/or sprinting toward the shooting officers or doing anything other than being under the influence of the Taser. Viewing the facts in Plaintiffs' favor, Desmond was not armed with knives and was not charging or threatening the officers when Fliehr shot him.

According to Defendant Gagnebin, Desmond stood up, bent down picked up an object, made slashing motions by raising his hands above his head and swinging them down to mid-section level, and charged at Fliehr and Gagnebin. Here again, none of the other officers saw Desmond stand and then bend down to pick up an object or saw him slash his arms up over his head and down. Sergeants Lefkowitz and Williams did not see Desmond make any type of slashing movement or charge at the shooting officers. Defendants assert that the object Desmond held was sharp. That the object has a point does not make it sharp. Plaintiffs maintain that the object—a broken piece of wood with a strike plate and nail on it—is not properly considered to be a dangerous weapon and is certainly not a knife, is not capable of stabbing or cutting, and does not remotely resemble the kitchen knives that Desmond initially held. At most, Desmond could have bludgeoned the Defendant Officers with "the

object" (provided that they allowed him to); however, Gagnebin was holding the shield, thereby protecting him and Fliehr from the potential effects of the object.

According to Defendant Cumber, Desmond was slashing his arms from side to side such that he never revealed his hands and that he moved quickly toward the shooting officers. Of course, this account is belied by Sergeant Lefkowitz who also observed Desmond from behind and testified that he was able to see Desmond's hands and clearly saw that he had a piece of wood with a strike plate on it in one of his hands. Neither of the Sergeants saw Desmond make any type of slashing motion or charge at the shooting officers.

Viewing the facts in the light most favorable to Plaintiffs, the Defendant Officers were surprised to find Desmond at the front door, botched their tactical plan to approach Desmond, squandered viable less intrusion force alternatives, panicked when Desmond regained his feet and the Taser effects stopped, and simply started shooting in violation of Desmond's constitutional rights.

### 3. Qualified Immunity Analysis

("[A]t summary judgment, an officer may be denied qualified immunity in a Section 1983 action 'only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation.'") *Hughes v. Kisela*, 862 F.3d 775, 783 (9th Cir. 2016).

Plaintiffs' maintain material fact questions preclude summary judgment on the qualified immunity question. There are several versions of the subject incident for a jury to decide between:

- If the jury accepts Sergeant Lefkowitz's version, that Desmond's movements just prior to being shot were obviously from him being under the effects of the taser, not active threatening motions, then qualified immunity does not apply. Because, it was clearly established that officers may not use deadly force against a person who is armed but cannot reasonably be perceived to be taking any furtive, harrowing, or threatening actions. See *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013); *Curnow By and Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 324–25 (9th Cir. 1991); see also *Estate of Lopez*, 871 F.3d at 1020 (holding that *George* and *Curnow* clearly established this principle at the time of the shooting in that case,

October 22, 2013). This is true even in circumstances in which the suspect has allegedly "committed a violent crime in the immediate past." See *Harris v. Roderick*, 126 F.3d 1189, 1203–04 (9th Cir. 1997).

- Same result if the jury accepts Sergeant Williams' version: that Desmond popped up once the Taser was no longer effective and was not making any slashing motions when he was shot. *George*, 736 F.3d at 838.

- Plaintiffs' concede that qualified immunity might apply if the jury accepts the most threatening of the Defendant Officers' version of the event: that Desmond was charging and slashing with "the object" at the time he was shot. It is fairly standard concept that if the suspect threatens the officer with a weapon deadly force may be used. *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014). Defendants argue that "the object" was either a knife or as sharp as a knife, but Plaintiffs have already established with certainty that it was not a knife or anything resembling or as dangerous as a knife. That notwithstanding, the Ninth Circuit recently granted qualified immunity to officers who used deadly force on suspect who was armed with a 2-foot long broken piece of hockey stick. See *Woodward v. City of Tucson*, 870 F.3d 1154 (9th Cir. 2017). However, that case is highly distinguishable. In *Woodward*, the officers were investigating a reported trespass of a vacant apartment. *Id*. 870 F.3d 1156. Apparently, it was *undisputed* that upon the officers' opening the bedroom door, the suspect charged them, yelling and growling, with the broken hockey stick upraised in a threatening manner, that it was difficult for the officers to retreat and the officers issued a warning before firing. *Id*. 870 F.3d 1155, 1162. Whereas here, it is disputed that Desmond charged the shooting officers with the object upraised in a threatening manner, that it was difficult for the officers to retreat (indeed, based on some of the officers testimony, Desmond did not charge, did not hold the piece of broken door jamb in any threatening manner, and one officer changed his story in deposition to wrongfully make it seem that Desmond charged the officer when in fact he only saw movement toward the officers and took his attention off of Desmond and didn't look back until shots had been fired. And it is undisputed that the officers did not warn Desmond that they would shoot him, the officers had Desmond surrounded, and the less

lethal second Taser was in the process of being deployed. Aside from the suspect being "armed" with a broken piece of wood in an apartment, there are very few similarities to *Woodward*.

Since the applicability of qualified immunity depends on which version of the subject incident the jury finds credible, summary judgment is not appropriate.

**C. Material Fact Questions Concerning Whether the Defendant Officers Accommodated Desmond's Mental Illness Preclude Summary Judgment on Plaintiffs' ADA Claim**

Defendants do not challenge the merits of Plaintiffs' ADA claim. Instead, they confoundingly assert that Plaintiffs' ADA claim should be dismissed, as a matter of law, because the Defendant Officers are entitled to qualified immunity. This argument is baseless.

Title VII of the ADA prohibits a *public entity* from discriminating against a qualified individual with a disability based on that disability. 42 U.S.C. § 12132. The ADA does not apply to individuals, only to public entities. See *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002). Qualified immunity is only available to government officials, and not government entities. See *Wood v. Moss*, 134 S.Ct. 2056, 2066-67 (2014); see *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978). Because there is no individual liability under the ADA, there is also no qualified immunity for public officials under the ADA.

Defendants misapprehend the holding of *City & Cty. of San Francisco, Calif. v. Sheehan*, . which maintained the longstanding principle that public officials are immune from suit for money damages under 42 U.S.C. § 1983 unless they have "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." 135 S. Ct. 1765, 1774 (2015) (*Sheehan II*). "Although the [*Sheehan*] Court granted certiorari as to whether Title II requires 'any accommodation of an armed and violent individual,' it later dismissed that issue as improvidently granted. *Sheehan*, 135 S.Ct. at 1772, 1774. Therefore, the Ninth Circuit's ruling on the ADA's applicability to arrests (in *Sheehan v. City & County of SF.*, 743 F.3d 1211 (9th Cir. 2014) (*Sheehan I*)) controls. See *Vos v. City of Newport Beach*, 892 F.3d 1024, 1036 (9th Cir. 2018) (*Vos*). So, Defendants' tortured analysis that *Sheehan II* somehow applies qualified immunity to ADA claims is completely false. *Sheehan II* says nothing of the sort, and the frivolous ADA qualified immunity

claim is non-existent and stands in stark opposition to the actual existing law of the ADA, *Sheehan I* and *Vos*.

Although Defendants do not lodge a *Sheehan I* analysis into the merits of Plaintiffs' ADA claim, in an abundance of caution, Plaintiffs' briefly discuss how material fact questions preclude summary judgment on this claim.

"To state a claim under Title II of the ADA, a plaintiff generally must show: (1) [ ]he is an individual with a disability; (2) [ ]he is otherwise qualified to participate in or receive the benefit of a public entity's services, programs or activities; (3) [ ]he was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of h[is] disability." *Sheehan I*, 743 F.3d at 1232. Plaintiffs' maintain that Defendant City failed to accommodate Desmond's mental illness. Defendants Fliehr and Gagnebin had a recent interaction with Desmond, where they had to place him in a full body restraint just to detain him for a 5150 hold. Remarkably, none of the other responding officers knew of this recent history and Fliehr and Gagnebin (and apparently dispatch) did not share it with them. Even though the subject of the instant call was "probable 5150" and Desmond was acting bizarrely, Gagnebin and Cumber still had not personally determined that Desmond suffered, or at least appeared to suffer, from mental illness. The subject incident is analogous to that of *Vos*, 892 F.3d 1024, which also involved an erratic subject, a hostage situation, perfunctory attempts at communication, and failure to use on scene less-lethal alternative means to deadly force. There the Ninth Circuit found that "the officers [] had the time and the opportunity to assess the situation and potentially employ the accommodations identified by the parents, including de-escalation, communication, or specialized help." *Id*., 892 F.3d at 1037. And similar to *Vos*, the officers pre-shooting conduct "arguably show[s] further accommodation was possible." *Id*.

Defendants argument on this point must fail.

**D. The Defendant Officers' Conduct Shocks the Conscience in Violation of the Fourteenth Amendment**

Defendants argue that Plaintiffs' Fourteenth Amendment claim fails because there is no evidence of the officers' ulterior motive. Such as showing is not required.

Plaintiffs' Fourteenth Amendment claim requires Plaintiffs prove that the officers' use of force shocks the conscience. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014). The primary legal question under this standard is whether it can be met by a showing of deliberate indifference, or whether the plaintiff must instead show a purpose to harm for reasons unrelated to legitimate law enforcement objectives. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). If the circumstances were such that actual deliberation was practical, liability may attach from an officer's deliberate indifference. *Id*. at 1138. "Deliberation" for the purposes of the "shocks the conscience" test is not a literal concept and is not necessarily tied to the amount of time allowed for consideration before action. *Id*. at 1139.

Here, the Defendants knew that Desmond suffered from mental illness and had time to make a proper and appropriate tactical plan. Instead, they squandered their plan and panic-shot Desmond an excessive amount of times when he held nothing more than a broken piece of wood and when the Taser, which had proven to be effective was on scene and in the process of being redeployed. It is arguable that the shooting officers would have refrained had Defendant Cumber simply communicated that he was redeploying the Taser. These Defendants conduct both shocks the conscience and evinces a purpose to harm. Defendants' arguments to the contrary must fail.

**E. Material Fact Questions Preclude Summary Judgment on Plaintiff's *Monell* Claims**

The Supreme Court has held that "a municipality may only be sued under section 1983 if the action that is alleged to be unconstitutional implement [ed] or execute[d] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers, or the city made a deliberate or conscious choice to fail to train its employees adequately." *Boyd v. Benton Cty.*, 374 F.3d 773, 784 (9th Cir. 2004) (citing *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 690 (1978)); *Mackinney v. Nielsen*, 69 F.3d 1002, 1010 (9th Cir. 1995)) (internal citations and quotation

marks omitted). Defendants move for summary judgment on Plaintiffs' *Monell* claims arguing there is no facts that could give rise to *Monell* liability.

A municipality's failure to train its employees may create Section 1983 liability where the "failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001). "The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy." *Long v. Cnty of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). Defendants argue that Plaintiffs' cannot prove that the deficiency in training actually caused the officer's [sic] indifference to the plaintiff's [sic] constitutional rights." This is confounding because *City of Canton* holds that the training must be so deficient that it can be said the municipality is deliberately indifferent to the rights of the plaintiff and the citizenry. Here, the Defendant Officers knew Desmond suffered from mental illness, did not share this information, or even personally use the information to inform their interaction with them. Their training does not require that this type of previous-interaction-information be shared or considered. A jury may well determine that this deficiency in training is the moving force behind the harm Desmond and Plaintiffs' suffered.

Defendants' argument on this point must fail.

**F. Material Fact Questions Preclude Summary Judgment of Plaintiff's State Law Claims**

Plaintiff's state law claims survive summary judgment for largely the same reasons as the constitutional claims.

*1. Battery*

Plaintiffs have established that material questions of fact and credibility determinations preclude summary judgment on the issue of reasonableness in the constitutional context and these same material fact questions and credibility determinations likewise preclude summary judgment on Plaintiffs' tort claims. See *Nelson v. City of Davis*, 709 F.Supp.2d 978, 992 (2010) (citing *Edson v City of Anaheim*, 63 Cal,App.4th 1269, 1272 (1998)).

### 2. Negligence and NIED[1]

Plaintiffs assert that they are entitled to recover damages resulting from the tortuous acts of the Defendant Officers which resulted in decedent's death, specifically wrongful death negligence. Plaintiffs assert direct liability against the Defendant Officers and against Defendant City under a theory of respondeat superior for wrongful death. See Cal.Civ.Proc. Code § 377.60 (providing the statutorily-created right of an heir to recover damages resulting from a tortious act which results in the decedent's death).

"The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Center*, 140 Cal.App.4th 1256, 1264 (2006). The California Supreme Court has held that "an officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." *Munoz v. Olin*, 24 Cal.3d 629, 634 (1979) (citing *Grudt v. City of Los Angeles*, 2 Cal.3d 575, 587 (1970)). In this context, to prove the tort, a plaintiff must show that the officer violated his "duty to use reasonable force under the totality of the circumstances." See *Brown v. Ransweiler*, 171 Cal.App.4th 516, 526, fn.10 (2009). Importantly, the California Supreme Court has reaffirmed long-standing precedent that where an officer's preshooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, negligence "liability can arise if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes v. Cnty of San Diego*, 57 Cal.4th 622, 632 (2013) (emphasis original).

The *Hayes* Court expressly distinguished California's wrongful death – negligence standard from that of the rule that applies to violations of the federal Constitution's Fourth Amendment which focuses "more narrowly than state tort law on the moment when deadly force is used, placing less emphasis on preshooting conduct." *Hayes, supra*, 57 Cal.4th at 638 (internal citations omitted). "The Fourth Amendment's 'reasonableness' standard is not the same as the standard of 'reasonable care'

---

[1] Contrary to Defendants' prediction, Plaintiffs' do not allege a "provocation theory" argument. The former "provocation rule' proscribed force used after an unlawful entry. Plaintiffs do not take issue with the Defendant Officers' entry into the apartment or initial deployment of the Taser.

under tort law, and negligent acts do not incur constitutional liability." *Id*. citing, *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002).

Here again, the Defendant Officers failed to even discuss Desmond's mental illness or factor it into their tactical plan, developed a perfunctory plan, botched their own plan by failing to gain control of Desmond while he was under the effect of the Taser, and panic-shot Desmond when redeploying of the Taser was imminent and there were other less intrusive means available. A reasonable jury may well determine Defendants were negligent for this conduct. By extension, a finding of negligence supports Plaintiffs' NIED bystander claims as they were all present and inside the apartment when the shooting occurred, were contemporaneously aware of it and its accompanying negligence, and it is undisputed that Mr. Phillips began crying over the death of his son the moment he exited the bedroom. *Thing v. La Chusa*, 48 Cal.3d 644, 651 (1989).

### 3. Bane Act

Defendants argue that Plaintiffs' Bane Act claim must fail because it requires independent evidence of threats, intimidation, or coercion. The Ninth Circuit has expressly rejected this notion.

The Tom Bane Civil Rights Act (Section 52.1) civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law where the interference is carried out "by threats, intimidation or coercion." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (citing *Venegas v. Cnty of Los Angeles*, 153 Cal. App. 4th 1230, 1242 (2007)). Claims under section 52.1 may be brought against public officials who are alleged to interfere with protected rights, and qualified immunity is not available for those claims. See *Venegas*, 153 Cal. App.4th at 1245.

The Ninth Circuit has held that "the elements of [an] excessive force claim under Civil Code § 52.1 are the same as under § 1983." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014). However, while the Bane Act does not require the "threat, intimidation or coercion" element of the claim to be "transactionally independent from the constitutional violation alleged ... the Bane Act requires 'a specific intent to violate the arrestee's right to freedom from unreasonable seizure.'" *Reese*, 888 F.3d at 1043-1044 (citing *Cornell v. City and Cty. of San Francisco*, 17 Cal.App.5th 766 (2017)). When applying the specific intent standard to an excessive force violation, "a mere intention

to use force that the jury ultimately finds unreasonable—that is, general criminal intent is insufficient." *Reese*, 888 F.3d at 1045 (citing *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)). "Rather the jury must find that the defendants 'intended not only to use the force, but its unreasonableness, its character as 'more than necessary under the circumstances.'" *Id*.

Here, material fact questions preclude summary judgment on Plaintiffs' section 52.1 claim. According to Sergeant Lefkowitz, Desmond was under the effects of the Taser when he was shot, a jury can find shooting him to death under these circumstances shows a specific intent to violate his constitutional rights. See e.g. *Reese*, 888 F.3d at 1045. Similarly, Sergeant Williams testified that Desmond popped up but did not threaten with the object, so shooting him to death under those circumstances shows a specific intent to violate his rights. *Id*. And even accepting the Defendant Officers' version of the story, a reasonable jury can find that the excessive amount of shooting shows the requisite specific intent to violate decedent's constitutional rights.

Defendants' argument on this point must fail.

## CONCLUSION

Based on the foregoing, this Court must deny Defendants' motion for summary judgment.


Dated:  July 16, 2019                    **THE LAW OFFICES OF JOHN L. BURRIS**


*/s/ Benjamin Nisenbaum*
**JOHN L. BURRIS**
**BEN NISENBAUM**
**LATEEF H. GRAY**
**Attorneys for Plaintiffs**