1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

DAVID PHILLIPS, individually and as a co-successor-in-interest to Decedent DESMOND PHILLIPS; DELPHINE NORMAN, individually and as a co-successor-in-interest to Decedent DESMOND PHILLIPS; CHADRICK INGRAM, individually; K.T. by and through his Guardian Ad Litem LATISHA WILLIAMS,

                   Plaintiffs,

    vs.

CITY OF CHICO, a municipal corporation; JEREMY GAGNEBIN, individually and in his capacity as an officer for the Chico Police Department; ALEX FLIEHR, individually and in his capacity as an officer for the Chico Police Department; JARED CUMBER, individually and in his capacity as an officer for the Chico Police Department; and DOES 1-50, inclusive, individually and in their official capacities as police officers for the CITY OF CHICO Police Department,

                   Defendants.

CASE NO.: 2:18-cv-00153-JAM-DMC

**DECLARATION OF BENJAMN NISENBAUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Date: July 30, 2019
Time: 1:30 p.m.
Ctrm: 6

Honorable John A. Mendez

# EXHIBIT H

# Roger A. Clark
## Police Procedures Consultant, Inc.
10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com
### March 29, 2019

John L. Burris, Esq.
Ben Nisenbaum, Esq.
Lateef Gray, Esq
The Law Offices of John L. Burris
Airport Corporate Center
7677 Oakport Street, Suite 1120
Oakland, CA  94621

**Regarding:   *David Phillips, et al, v. City of Chico, et al.  Case 2:18-cv-00153 JAM-DMC***

Dear Counsel:

Thank you for retaining me to analyze and render rebuttal opinions regarding the March 17, 2017 shooting death of Mr. Desmond Phillips (Desmond), by Chico Police Department (CPD) Officer Jeremy Gagnebin (Officer Gagnebin) and Officer Alex Fliehr (Officer Fliehr).  Pursuant to the rebuttal requirements of Rule 26, I have studied the reports, deposition transcripts, audio and video recordings, CPD policies and procedures, autopsy report, shooting report, and other materials(as listed below) provided to me thus far regarding this case.  I have just been informed that a very large volume of material was suddenly given to you by the defendants which was previously unknown to exist. This material has not been provided to me.  Please be advised that if/when this, or any other additional information is submitted, it is likely that a supplemental report will be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.  That is, where there are differences in the events proffered by the Defendant Officers and/or witnesses versus those proffered by the Plaintiff and/or witnesses, I do not opine for the trier of fact regarding who are the more believable witnesses.  The resolution of any such conflicts are obviously the purview of a jury to decide.

Page 1 of  25

**<u>Material Reviewed Thus Far:</u>**

1.      Claim against the City of Chico.

2.      Complaint.

3.      Answer to Complaint.

4.      City of Chico Police Department Reports Case Number PCN 17-04/CPD 17-1876.

5.      Butte County District Attorney Investigation Report.

6.      Fliehr Homicide Interview.

7.      Gagnebin Homicide Interview

8.      Cumber Homicide Interview.

9.      Chico Police Department Policies 300, 302, 308, 309, 310, 312, 322, 414, 418, 466.

10.     9-1-1 Calls from 03/17/2017.

11.     Desmond Phillips Death Certificate.

12.     Forensic Autopsy Report.

13.     Butte County Sheriff's Office Coroner's Report Case Number D17-0405 (03/17/2017).

14.     CAD Call Information (03/17/2017).

15.     5150 Application (12/30/2016).

16.     CAD Call Information (12/30/2016).

17.     5150 Application (01/04/2016).

18.    CAD Call Information (01/04/2016).

19.    Autopsy Notes for Desmond Phillips (03/21/2017).

20.    Sheriff's Office County of Butte-Supplementary Autopsy Report (03/24/2017).

21.    Sheriff's Office County of Butte-Supplementary Autopsy Report (03/21/2017).

22.    Sheriff's Office County of Butte-Supplementary Autopsy Report (03/22/2017).

23.    Release of Patient Specimen(s).

24.    Sheriff's Office County of Butte-Supplementary Autopsy Report (03/27/2017).

25.    Central Valley Toxicology Report # CVT-17-3693.

26.    Sutter Health Medical Records for Desmond Phillips-06/03/2016.

27.    Sheriff's Office County of Butte-Supplementary Autopsy Report (03/22/2017).

28.    Butte County Sheriff's Office Property Report (Case # 17-0405).

29.    X-Ray Photos (Black and White).

30.    Email from Joel Schmidt to Jason Wines (03/22/2017).

31.    City of Chico Fire Department Report for Incident # 2017-602 (01/18/2017).

32.    City of Chico Fire Department Report for Incident # 2017-610 (01/18/2017).

33.    Butte County EMS Patient Care Report (03/17/2017).

34.    City of Chico Fire Department Report for Incident # 2016-12453 (12/30/2016).

35.   City of Chico Fire Department Report for Incident # 2017-2653 (03/17/2017).

36.   Chico Police Department Additional Victims Report #17-01876.

37.   Chico Police Department Property Receipt Case # 2017001876 (03/17/2017).

38.   Crime Scene Log (Case # 17-1876).

39.   City of Chico Report of Accident, Theft, Damage or Loss Involving City Property (Case # 17-1876) (03/17/2017).

40.   Email from Suzanne Bennett to Jason Wines (03/28/2017).

41.   Taser Printout-Serial # X130007AD (03/18/2017).

42.   Desmond Phillips RAP Sheet.

43.   Desmond Phillips Sacramento County Mugshot.

44.   Sacramento County DA Arrest Report # 0995211401 (06/03/2016).

45.   Ampla Health Medical Records for Desmond Phillips.

46.   Enloe Medical Center Medical Records for Desmond Phillips.

47.   CA Dept. of Justice Bureau of Forensic Services Field Investigation Report (CH-17-000111-0001).

48.   CA Dept. of Justice Bureau of Forensic Services Physical Evidence Examination Report (CH-17-000111-0002).

49.   Photos (Black and White).

50.   Bullet Worksheet.

51.   Sutter Health Medical Records for Desmond Phillips.

52.   California Welfare and Institutions Code Sections 5150, and  Penal
      Code Sections 13515.25, 13515.35 and 832.

53.   <u>Columbia Human Rights Law Review,</u> "Unreasonable Seizures of
      Unreasonable People:  Defining the Totality of Circumstances
      Relevant to Assessing the Use of Force Against Emotionally
      Disturbed People," by Professor Michael Avery, Spring, 2003.

54.   California POST Basic Learning Domains:
      a.    #1:  "Leadership, Professionalism & Ethics."
      b.    #2:  "Criminal Justice System."
      c.    #3:  "Policing in the Community."
      d.    #5:  "Introduction to Criminal Law."
      e.    #20: "Use of Force."
      f.    #23: Crimes in Progress."
      g.    #33: "Arrest Methods/Defensive Tactics."
      h.    #34: "First Aid and CPR."
      i.    #35: "Firearms/Chemical Agents."
      j.    #36: "Information Systems."
      k.    #37: "People with Disabilities."

55.   Taser Product Training and Product Warnings.

56.   Rule 26 Report by Clarence Robert Chapman, March 11, 2019.

57,   Declaration by Clarence Robert Chapman, March 26, 2019.

58.   Deposition Transcripts:
      a.    Officer Jeremy Gagnebin, March 19, 2019.
      b.    Officer Alex Fliehr, March 20, 2019.
      c,    Officer Jared Cumber March 20, 2019

59.   Overview of the incident scene via the internet.


**Brief Overview of Events:**

On March 17, 2017 at approximately 7:13 p.m., Mr. David Phillips called 9-1-1
requesting an ambulance be sent to his residence at Knoll Manor Apartments, located at
725 West 4th Street #3, Chico, CA, because his son, Desmond Phillips, was having a

"mental episode".  Mr. David Phillips told the dispatcher that law enforcement assistance was not needed at that time.  Paramedics were notified and responded to the Phillips' residence.  The dispatcher also advised David Phillips to call back if anything changed.

City of Chico Fire Department personnel, as well as a two-person emergency medical services (EMS) ambulance crew, were dispatched to the Phillips' residence.  The medical personnel entered the Phillips' residence, where they saw Desmond standing in the living room, with headphones on, sweating and dancing, as if in an altered state.  David Phillips greeted the responders and informed them that Desmond had been in that altered state for approximately two hours before their arrival.  David Phillips also told the medical personnel that Desmond had previously suffered brain trauma and had been diagnosed with PTSD as a result of being previously assaulted by police officers in Sacramento several months earlier.

The medical personnel tried to talk to Desmond by calling his name and stating that they were only there to help him.  As the medical personnel attempted to touch Desmond's arm, Desmond jerked away and began swinging his arms causing the medical responders to exit the residence.  While they were exiting the apartment, the medical personnel saw Desmond pick up a ceramic lamp.

City of Chico Police Officers Gagnebin and Cumber were also dispatched to the Phillips' residence regarding a possibly mentally ill person.  When Officers Gagnebin and Cumber arrived at the Phillips' residence, they saw that the solid front door was open, while the exterior metal mesh security gate was closed.  At this time, Desmond was inside the living room pacing with an object in his hands.  Officer Gagnebin tried to talk to Desmond through the metal security gate, but Desmond was unresponsive and did not appear to acknowledge the officers' presence.  At some point, Desmond threw this object at the metal security gate and closed the door.

Desmond then left the living room area, and presumably entered the kitchen area.  He emerged holding a kitchen knife in each hand.  Mr. David Phillips made a second call from inside his bedroom to 9-1-1 at approximately 7:27 p.m. and asked the dispatcher to "tell the police to step it up here, because my son is mental and he has a knife and is walking around."

Approximately two minutes later, David Phillips again called 9-1-1 from inside his bedroom near the rear of the residence and stated, among other things, that Desmond "just tried to stab me."  Mr. David Phillips also informed the 9-1-1 dispatcher that his two grandchildren were also inside the apartment in another bedroom.  During this

conversation, David Phillips stated, "Stop it Desmond - the police are coming."  Later, Mr. David Phillips could be heard saying, "He's trying to kick the door in.  He's trying to kick my bedroom door in.  He's trying to stab me now.  Come through the window."

Officers Gagnebin, Fliehr and Cumber had a discussion about their entry into the residence.  They decided that they would enter, use a taser to subdue Desmond, and then go hands on with Desmond once he was tased.  However, the manner in which entry was to be made was not discussed with Sergeant Williams, who was the scene commander.  My review of the material thus far indicates that even though there was sufficient time to develop a plan, there was no articulated plan in sufficient detail in place apart from simply deciding to enter the apartment and to use the taser first.

Their lack of planning included the fact that the officers present knew from prior experience with Desmond that he had previously had a psychological evaluation through a 5150 hold, and was mentally impaired.  In is uncontested in the record that Desmond's mental impairment was obvious during this incident leading up to the shooting.  Yet there was no plan in place to take into consideration Desmond's obvious mental impairment.

I have noted that Sergeant Williams had a less-lethal shotgun in his police car, which the officers were aware of, but inexplicably failed to retrieve for use.  It appears they discussed Sergeant Williams getting his less-lethal shotgun, and he indicated on-scene that he would do so, but ultimately he did not.  Additionally, Desmond was seen by the officers with earbuds (small in-ear headphones) in his ears, making it even more predictable that Desmond would not respond to verbal commands.  Additionally, it cannot be overstated that the officers failed to make any effort to identify the location of the other people in the dwelling and to identify and potentially remove them from any danger that Desmond could have posed to them.

At some point, after allegedly hearing from dispatch that Desmond was trying to stab his father, Sergeant Williams authorized entry by saying "go, go, go."  The security door was opened and the front door was kicked in by Officer Fliehr.  Prior to entering the apartment, Officer Cumber, who was assigned the less lethal option of the taser, advised "taser, taser, taser."  The officers then entered the apartment.

Officer Cumber then fired his taser at Desmond, who immediately fell to the ground, indicating that the taser had the intended effect.  Yet, even though the officers had planned on going hands on if/when the taser had the desired effect (which it did), they neglected to do so.

The record documents that when Desmond fell to the floor, Officers Fliehr and Gagnebin were in front of Officer Cumber and were within 5 feet of where Desmond's body fell to the floor. At this point, Desmond no longer posed a credible threat of great bodily harm or death. Thus, the officers had ample time and opportunity to move and take Desmond into custody. This includes their opportunity to locate and move out of reach any weapon that Desmond may have possessed prior to being tased. Instead, the defendants appeared to freeze - a seminal tactical blunder - and utterly squandered their opportunity for Desmond's safe apprehension.

It is axiomatic that all officers are trained to watch the hands of subjects they engage, and this is especially true when the subject is known to be armed. Consistent with their basic POST training, the officers were all trained to watch a subject's hands in situations like the subject-incident involving Desmond. I have noted that Officer Cumber testified that he never saw any weapon in Desmond's hands after the officers reopened the door. Yet Officer Fliehr testified that Desmond had a knife in both hands (one in each hand), and swung his arms in a short-armed freestyle swimming motion not above his head after the officers reopened the door. Contrary to Officer Fliehr, Officer Gagnebin testified that while he had earlier seen Desmond with a knife in both hands, after they re-opened the door, he saw only one knife in Desmond's right hand, which Desmond allegedly picked up from the ground and raised it over his head, and then made slashing motions with both hands from above his head downward.

The three different accounts regarding the movements used by the officers to justify the shooting appear to be irreconcilable, and it may be that Desmond was not in possession of any weapon, and lethal force was totally unreasonable at the moment it was used. Even if he was armed, the officers had ample less-intrusive alternatives to lethal force leading to the shooting, including stepping back and re-deploying the Taser which had proven itself effective. I do not criticize the use of the Taser as described by the officers. It was an appropriate weapon to use under the circumstances, and should have been used again instead of lethal force.

Furthermore, Officers Fliehr and Gagnebin fired their guns excessively (not that the circumstances warranted lethal force in any event): Officer Fliehr fired first, and fired his semi-automatic gun 9 separate times at close range to Desmond, while Officer Gagnebin fired his semi-automatic gun a second or two after hearing Officer Fliehr's gun fire, and fired his own gun "approximately 7 times". Notably, Officer Gagnebin has not been trained in how to avoid "contagious fire", also referred to as, "sympathetic fire."

It is my opinion that the gunfire prevented the appropriate redeployment of the Taser, that the gunfire was unreasonable because the officers were never in danger from Desmond to

the point they could not have reasonably removed themselves from that danger, and that the excessive shooting demonstrates that the shooting officers did not re-assess after their initial shots (which were themselves unreasonable).  In my experience, this level of excessive shooting is indicative of a panic shooting, and consistent with sympathetic and contagious gunfire.


**POST Training Regarding Force Options:**

Subjects' resistance/actions to an arrest will determine the type of force used by peace officers.  The following chart illustrates how a subject's resistance/actions can correlate to the force applied by an officer.  (Listed as Subject's Actions, Description of Resistance and Possible Force Option):

> *Cooperative* - Subject offers no resistance:
> - Mere professional appearance
> - Nonverbal actions
> - Verbal requests and commands
>
> *Passive non-compliance* - Does not respond to verbal commands but also offers no physical form of resistance:
> - Verbal requests and commands
> - Officer's strength to take physical control, including lifting/carrying
> - Control holds and techniques to direct movement or immobilize a subject
>
> *Active resistance* - Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling an intention to avoid or prevent being taken into or retained in custody:
> - Control holds and techniques to control the subject and situation
> - Use of personal weapons in self-defense and to gain advantage over the subject
> - Use of devices to secure compliance and ultimately gain control of the situation
>
> *Assaultive* - Aggressive or combative; attempting or threatening to assault the officer or another person:

- Use of devices and/or techniques to secure compliance and ultimately gain control of the situation
- Use of personal body weapons in self-defense and to gain advantage over the subject

*Life-threatening* - Any action likely to result in serious injury or possibly the death of the officer or another person
- Utilizing firearms or any other available weapon or action in defense of self and others

Officers are also trained that they must take into account the *totality of the circumstances* when selecting a reasonable force option.  It is not the intent of this chart to imply that an officer's force options are limited based on any single factor.

Peace officers are also trained that they must use the force option appropriate for the situation as conditions may change rapidly. Officers must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options.  (LD 20: Chapter 2 – Force Options, pages 2-6 & 2-7 )


## POST Training Regarding the Use of Deadly Force:

Officers are trained that the use of deadly force is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by the reverence for all human life (including the officer's life and others that may be in imminent danger) and, used only when other means of control are unreasonable or have been exhausted

"The criminal justice system gives law enforcement two extraordinary powers:
- the power of arrest
- the power to use deadly force

"The authority to do so does not come from the rule of an authoritarian dictator. *Rather it comes from the will and consent of the people who put their trust in law enforcement to use that power with the utmost of care and restraint.* This is why it is important to emphasize that peace officers do not confer "police powers" on themselves. These powers come to the criminal justice system from the people they serve."  (POST Learning Domain #2 Criminal Justice System," page 1-4.  Emphasis added.)

POST trains that *Deadly Force* applied by a peace officer is force that creates a substantial risk of causing death or serious bodily injury.  Consequently, reverence for all life is the foundation on which the use of deadly force rests.  The authority to use deadly force is an awesome responsibility given to peace officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

An officer may use deadly force to protect oneself or others when the officer has the objective and reasonable belief that his/her life, or the life of another, is in imminent danger of death or serious physical injury based upon the totality of the facts known to the officer at the time.  (LD 20: Chapter 3 –Use of Deadly Force, page  3-3.)

Related Terms: - In order to understand the aspects of the use of deadly force, peace officers are trained that they need to become familiar with the following terms.

> *Serious bodily harm or injury* means a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement. *(Penal Code Section 243(f)(4))*

> *Reasonable necessity* means that delay in apprehension would create substantial and unreasonable risk to officers or others possibly resulting in serious physical injury or death.

> *Imminent danger* means a significant threat that peace officers reasonably believe will result in death or serious bodily injury to themselves or to other persons. Imminent danger is not limited to "immediate" or "instantaneous." A person may pose an imminent danger even if they are not at the *very moment* pointing a weapon at another person.

> *Sufficiency of fear* - According to the law, fear alone does not justify the use of deadly force.  There must be a *sufficiency of fear* for the use of deadly force to be justified. (Penal Code Section 198).  There are three elements needed to establish sufficiency of fear.

> > •    The circumstances must be sufficient to excite the fears of *a reasonable person* in like circumstances.
> > •    The person must not act *under the influence of fear*

*alone*. There has to be some circumstance or overt act
apart from the officer's fear.
•       The decision to use deadly force must be made *to save
one's self or another* from great bodily injury or death.

POST also trains that the decision of whether or not to use deadly force may be
influenced by the officer's:

•       training and experience
•       judgment
•       mental alertness
•       emotional maturity
•       existing facts and circumstances
•       understanding of the law as it relates to
        - agency policies concerning the use
        - amount of force that is objectively reasonable to
        achieve the law enforcement mission (LD 20: Chapter
        3 –Use of Deadly Force, page  3-6 & 3-7.)

In this case, the Defendant Officers were aware that Desmond was possibly armed with a
knife.  Every California police Officer is trained in such a way that there should be no
room for fear-based action.  The defendant Officers successfully incapacitated Desmond
with the taser–the only appropriate level of force for the situation, and failed to capitalize
on their success by quickly handcuffing or securing Desmond's arms and legs.  Instead,
the Officers stood stolid and allowed Desmond to allegedly gain his composure and stand,
then Officer Fliehr appeared to fire out of fear which prompted contagious fire from
Officer Gagnebin.  Their failure to follow policy, training, and their designated plan to
secure Desmond after the taser deployment, led to Desmond's untimely death.

**Mentally Ill Sections 13515.25 & 13515.35 PC:**

I have noted and quoted above the understanding that Officers at the scene knew about
Desmond's mental impairments (which combined with his advanced age and previous
contacts with law enforcement).  As POST Certified Law Enforcement Officers, they
allegedly received the POST Basic training as required by law and as outlined in Learning
Domain #37.  The requirement is as follows:

13515.25 PC.

(a)     By July 1, 2006, the Commission on Peace Officer Standards and Training shall establish and keep updated a continuing education classroom training course relating to law enforcement interaction with mentally disabled persons.  The training course shall be developed by the commission in consultation with appropriate community, local, and state organizations and agencies that have expertise in the area of mental illness and developmental disability, and with appropriate consumer and family advocate groups.  In developing the course, the commission shall also examine existing courses certified by the commission that relate to mentally disabled persons.  The commission shall make the course available to law enforcement agencies in California.

(b)     The course described in subdivision (a) shall consist of classroom instruction and shall utilize interactive training methods to ensure that the training is as realistic as possible. The course shall include, at a minimum, core instruction in all of the following:

(1)     The cause and nature of mental illnesses and developmental disabilities.

(2)     How to identify indicators of mental disability and how to respond appropriately in a variety of common situations.

(3)     *Conflict resolution and de-escalation techniques for potentially dangerous situations involving mentally disabled persons.*

(4)     *Appropriate language usage when interacting with mentally disabled persons.*

(5)     *Alternatives to lethal force when interacting with potentially dangerous mentally disabled persons.*

(6)     Community and state resources available to serve mentally disabled persons and how these resources can be best utilized by law enforcement to benefit the mentally disabled community.

(7)     The fact that a crime committed in whole or in part because of an actual or perceived disability of the victim is a hate crime punishable under Title 11.6 (commencing with Section 422.55) of Part 1.

(c)    The commission shall submit a report to the Legislature by October 1, 2004, that shall include all of the following:

    (1)    A description of the process by which the course was established, including a list of the agencies and groups that were consulted.

    (2)    Information on the number of law enforcement agencies that utilized, and the number of officers that attended, the course or other courses certified by the commission relating to mentally disabled persons from July 1, 2001, to July 1, 2003, inclusive.

    (3)    Information on the number of law enforcement agencies that utilized, and the number of officers that attended, courses certified by the commission relating to mentally disabled persons from July 1, 2000, to July 1, 2001, inclusive.

    (4)    An analysis of the Police Crisis Intervention Training (CIT) Program used by the San Francisco and San Jose Police Departments, to assess the training used in these programs and compare it with existing courses offered by the commission in order to evaluate the adequacy of mental disability training available to local law enforcement officers.

(d)    The Legislature encourages law enforcement agencies to include the course created in this section, and any other course certified by the commission relating to mentally disabled persons, as part of their advanced officer training program.

(e)    It is the intent of the Legislature to reevaluate, on the basis of its review of the report required in subdivision ©, the extent to which law enforcement officers are receiving adequate training in how to interact with mentally disabled persons. 13515.35.

(a)    The commission shall, upon the next regularly scheduled review of a training module relating to persons with disabilities, create and make available on DVD and may distribute electronically a course on how to recognize and interact with persons with autistic spectrum disorders. This course shall be designed for, and made available to, peace officers who are first responders to emergency situations.

(b)     The training course shall be developed by the commission in consultation with the Department of Developmental Services and appropriate community, local, or other state organizations and agencies that have expertise in the area of autism spectrum disorders. The commission shall make the course available to law enforcement agencies in California.

(c)     In addition to the duties contained in subdivisions (a) and (b), the commission shall distribute, as necessary, a training bulletin via the Internet to law enforcement agencies participating in the commission's program on the topic of autism spectrum disorders.

In accordance with the Penal Code, specific training to persons with mental illness is included in the POST Basic curriculum (Learning Domain #37: "Persons with Disabilities," Chapter 4, "Mental Illness.") and states in part:

"Law enforcement routinely encounters persons with mental illness in a variety of settings.  The causes and impacts of mental illness vary and are not bound by race, gender, or socioeconomic status.

"How peace officers respond to persons living with a mental disorder can have tremendous impact on how these encounters will be resolved.  The basic philosophy of any law enforcement officer should be to respond in a manner that is humane, compassionate, and supportive.

"Mental illnesses are a medical condition that affect a person's thinking, feeling, mood, ability to relate to others, and disrupts daily functioning. Persons managing a mental illness can have a substantially diminished capacity for coping with the ordinary demands of life.  Mental illnesses can affect people of any age, race, religion, or income and background.  Several million people in this country are diagnosed with a serious long term mental illness.  The good news about mental illness is that recovery is possible." (POST Learning Domain #37, page 4-4.)

As stated above, the basic training materials regarding persons suffering from mental illnesses express concerns for the safety of the public, the responding officers, and the subject of the incident.  A centerpiece of the basic training and policies includes the recognition that all mentally disturbed subjects are considered to be ill-not a criminal suspect.  This expectation applies to this incident and includes:

- Dealing with the "Threat Triad" (feeling threatened, out of control and out of options).
- Interpersonal engagement and de-escalation (slowing down to reduce anxiety).
- Use of backups (reduces necessity for force).
- Tactical considerations (proper use of basic field tactics).
- Effective communication and initial response (understanding mental illness behaviors and the use of tactical communication methods).
- The crisis cycle (as anxiety increases, the subject's ability to comply decreases).
- Crisis intervention teams (the use of trained personnel to intervene).
- Force options (must be reasonable and suited to the situation).

In his brief (cited above): *Unreasonable Seizures of Unreasonable People: Defining the Totality of Circumstances Relevant to Assessing the Police Use of Force Against Emotionally Disturbed People* Professor Michael Avery wrote, "Untrained officers, or those who forget or disregard their training, are far more likely to exacerbate the tensions inherent in confrontations with emotionally disturbed people are thus more likely to escalate the risk of a violent outcome."  In my opinion, this is precisely what occurred here.

**Additioinal Rebuttal Opinions Other Than Already Expressed Above:**

1.  In the United States the reverence for life is of paramount importance.  As stated above, this principle is taught to all law enforcement officers (both federal and local) as a value at the very heart of the our professional standard of care.  In my opinion, given the set of facts, there is nothing in the record to indicate that Desmond posed a credible lethal threat to the Defendant Officers that they could not accommodate by obvious reasonable alternatives - including simply staying out of Desmond' range of motion. Desmond was mentally ill (a fact know to all Officers present), and was, at one point, incapacitated.  The Officer's failure to secure Desmond, after he was incapacitate, cannot be excused or explained away.

2.  When Officer Cumber's first taser shot obviously succeeded.  Taser trains that the incapacitation provides a safe "window of opportunity" for a hands-on apprehension.  Taser trains that the taser

in this situation could be applied a second time, or used in a quick extended drive-stun mode, or reloaded with a second cartridge Officer Cumber was not excused from using his taser accordingly. Officer Cumber's failure to continue to cycle through taser cycles apparently allowed Desmond to get to his feet as alleged) and procure a knife (as alleged).

3.      The gunfire was unreasonable, and excessive, because the officers were never in such a degree of danger from Desmond that they could not have reasonably removed themselves from the situation; furthermore, the shooting demonstrates that the shooting officers did not re-assess after their initial shots (which were themselves unreasonable). In my experience, this level of excessive shooting is indicative of a panic shooting, and consistent with sympathetic and contagious gunfire.

**POST Re-evaluation of Force Requirement:**

"Peace officers must use the force option appropriate for the situation as conditions may change rapidly.  Officers must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options."  (POST Learning Domain 20, page 2-7.)

4.      The scope and magnitude of the force used was grossly excessive as taught to all officers:

"**Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate."

"Malicious assaults and batteries committed by peace officers constitute unlawful conduct.  When the force used is unreasonable, the officer can face criminal and civil liability, and agency disciplinary action."  (Learning Domain #20, page 6-4.)

5.      Taking the Defendant Officer's set of facts as true, that Desmond fell to the floor and was incapacitated by the taser, then Officer Cumber failed in his duty to intervene with Officers Fliehr and Gagnebin to prevent and/or stop the unnecessary and excessive force inflicted on

Desmond (the simplest intervention would have been to deploy another taser cycle):

"The community expects that its peace officers will use only reasonable amounts of force.  Likewise, it expects that someone, including peace officers, will intervene if reasonable force is exceeded.  For the community and the officer's protection, the officer must know the laws pertaining to intervention.

"Peace officers are required by their position to intervene in any force situation they perceive as excessive."  (POST Learning Domain: #20 "Use of Force," Chapter 6 - Consequences of Unreasonable Force, page 6-7.)

"The United States Constitution protects individuals from unlawful actions of peace officers.  NOTE: The officer who fails to intervene, for whatever reason, is also held accountable by the United States Code."  (POST Learning Domain: #20 "Use of Force," Chapter 6 - Consequences of Unreasonable Force, page 6-8.)

6.     The Chino Police Department, through its chain of command, appears to have endorsed the dangerous and out-of-policy tactics that are connected to this incident and the prior incidents discussed.  As such, their collective approval of these tactics puts the general public at unnecessary future risk of death and/or injury from the Defendant Officers, and others on the department who have been, or are now, similarly trained and/or supervised.


**My Qualifications To Review This Case:**

My opinions are based in part on my training, professional experience and education.  I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant.  I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988).  The POST Command College was a Masters level two-year

course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1750 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents.  From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous.  Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.  This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department.  These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel."  This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin.  I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission.  I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury.  I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts.  I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California.  I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana.  I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the

M26 and X26 Taser weapons."  On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert."  On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas).  As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden.  The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp2nd.1047.  I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007).  The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008).  The *Torres* case was appealed to the U.S. Supreme Court and returned for trial.  I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.*  (USDC Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD.  My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014).  The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011).  The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011).  The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013).  The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012).  The Ninth Circuit also drew from my expert report regarding the use of impact weapons

(PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012).  I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014).  Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014).  I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644.  My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184.  My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.*  No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.*  No. 14-15098 (for publication).  My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication).  My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.,* Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches.  My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force.  My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322*, Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force.  My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons.  My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit.  My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity.  My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force.  I participated as a retained expert in the USDC Fifth District case, Stephen McCollum et al., v. Texas Department of Criminal Justice, et al., Case No.3:12-CV-02037 regarding in-custody

hyperthermia deaths.  My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006).  The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).  I was quoted by the California Appellate Court (Second Appellate District, Division Three) in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography).  On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.  California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children,"pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers.  In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole.  The AG report was published May 12, 2016.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case.  A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs.  I own each, along with the download software.  I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices.  I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.  Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S.

Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW.  There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct.  Executed March 29, 2019 at Santee, CA.

Roger A. Clark